[No. 29279. Department One. August 22, 1944.]

THE STATE OF WASHINGTON, *Appellant*, v. LEROY
ST. CLAIR, *Respondent.*[1]

[1]Reported in 151 P. (2d) 181.

*Lloyd L. Wiehl* and *George M. Martin*, for appellant.

*Velikanje & Velikanje*, for respondent.

BEALS, J.—The defendant, Leroy St. Clair, was charged by the state of Washington, by way of a criminal complaint filed in justice court, with a misdemeanor, in that, in the county of Yakima,

"Leroy St. Clair, then and there being, and then and there having charge and custody of an animal, to-wit, one bay horse, did then and there willfully, knowingly, and unlawfully inflict unnecessary suffering and pain upon said horse by then and there dragging said horse behind a vehicle, to-wit, a tractor, causing said animal to be seriously injured to such an extent that said animal could not walk and that said Leroy St. Clair left and abandoned said injured horse for three days without care, said treatment causing said horse's death."

On his trial before the justice, the jury returned a verdict of guilty as charged. The defendant appealed to the superior court and, upon his trial before that court, the jury also returned a verdict of guilty. The defendant then moved for a judgment of acquittal notwithstanding the verdict or, in the alternative, for a new trial. The court granted the motion to dismiss and entered an order dismissing the proceeding with prejudice, from which order the state has appealed.

Error is assigned upon the ruling of the court sustaining respondent's motion for an order of dismissal; upon the order dismissing the proceeding; and also upon the giving of an instruction.

Rem. Rev. Stat., § 3187 [P. C. § 1960], defines the offense of cruelty to animals as follows:

"Every person who cruelly overdrives, overloads, drives when overloaded, overworks, tortures, torments, deprives of necessary sustenance, cruelly beats, mutilates or cruelly kills, or causes, procures, authorizes, requests or encourages so to be overdriven, overloaded, driven when overloaded,

overworked, tortured, tormented, deprived of necessary sustenance, cruelly beaten or mutilated or cruelly killed, any animal; and whoever having the charge or custody of any animal, either as owner or otherwise, inflicts unnecessary suffering or pain upon the same, or unnecessarily fails to provide the same with the proper food, drink, air, light, space, shelter or protection from the weather, or who willfully and unreasonably drives the same when unfit for labor or with yoke or harness that chafes or galls it, or check rein or any part of its harness too tight for its comfort, or at night when it has been six consecutive hours without a full meal, or who cruelly abandons any animal, shall be guilty of a misdemeanor,"

which section is supplemented by § 3200 [P. C. § 1973], the pertinent portion of which reads as follows:

"In this act, the singular shall include the plural; the word 'animal' shall be held to include every living creature, except man; the words 'torture,' 'torment,' and 'cruelty,' shall be held to include every act, omission, or neglect whereby unnecessary or unjustifiable physical pain or suffering is caused or permitted."

It appears that respondent was the owner of an unbroken three year old bay mare which for some time had been pastured upon the farm of Ralph Janshen, respondent's brother-in-law, and that, during the afternoon of Sunday, October 25, 1942, respondent and Janshen entered the pasture for the purpose of breaking the animal, which is referred to as a "colt." In the first place, they hitched the colt to its mother, but the colt balked and refused to follow, several times throwing itself to the ground. As the colt was heavier than the mare, this jarred the latter animal, and to obviate this difficulty, as respondent testified, the men attached the colt to a tractor by a rope which was placed around the colt, passing under its tail. Respondent and Janshen testified that the colt was still hitched to the mare, and that the tractor was used solely as a shock absorber, so that when the colt threw itself the entire jolt would not be borne by the mare. The colt continued to balk, throwing itself to the ground. On one occasion the colt refused to get up, and the men left it lying

as it fell and went in search of some cattle. On their return after a lapse of from an hour to an hour and a half, the colt arose from the ground, and the breaking operations proceeded. Concerning this phase of the proceedings, respondent testified:

"We tried to lead her again; just took a hold and tried to lead her by herself. She wouldn't come, move. Tried to drive her; she wouldn't move a foot. So I said, Well, We'll try and lead her again and see what she'll do this time. So we took the horse, had the tractor there, and tried to lead her; she just throwed herself over on her side with all four feet braced straight out."

Upon the approach of darkness, the colt having again thrown itself and failing to arise, respondent decided to leave the colt as it lay, tied to the tractor, during the night. The rope which passed around the colt was removed, and the animal was tied to the tractor by a rope fastened to the colt's halter. Respondent testified that he left the colt tied to the tractor so that it would not stray into the road. He told Janshen that if he did not return that night to release the colt from the tractor in the morning and turn it loose in the pasture, and that they would wait until winter for further breaking operations. Respondent then departed for his home, did not return to Janshen's that night, and had no further information concerning subsequent events until Wednesday evening.

Janshen testified that during the course of the following morning, he untied the rope that held the colt to the tractor. He stated that when he did this the colt raised its head but did not get up. He further testified that he was busily engaged with his farming operations, and did not again see the colt alive.

Mrs. Janshen testified that, sometime during the course of Tuesday morning, from a distance she saw the colt standing on its feet.

Between ten and eleven o'clock on Tuesday morning, Kenneth Wolverton visited the Janshen ranch to pick up the tractor for the purpose of repairing the same. He found the colt lying behind the tractor, and, as it seemed to him,

in a dying condition. Upon his return to Yakima, he informed an officer of the local humane society of what he had seen. At about ten o'clock Wednesday morning, Ray Walker, in company with an officer of the humane society, visited the Janshen ranch, where they found the colt dead, the body being still warm. They loaded the dead colt on a truck and took it away. No investigation was made for the purpose of determining the cause of the colt's death.

It appears from the evidence that the field in which the colt was left lying contained alfalfa, and that water was running in an open ditch about fifty feet from where the colt lay, tied to the tractor until Monday morning. While the colt was tied to the tractor it could, of course, obtain neither water nor food.

Respondent argues that no evidence whatever was introduced from which the jury could have found that any pain was inflicted on the colt by respondent. Respondent and Janshen testified that the colt, while lying down, was not dragged along the ground by the moving tractor. These witnesses testified that the purpose of attaching the colt to the tractor was to save the mare from the jolt caused when the colt threw itself on the ground. It would seem that this purpose would not be accomplished unless, when the tractor, the mare, and the colt were moving, the rope by which the colt was attached to the tractor was taut and the moving tractor was exerting some force upon the colt to make it follow. When the colt would throw itself to the ground, as described by respondent, the tractor would not stop of itself, but would continue onward until its driver stopped it. How soon after the colt would strike the ground, or brace itself in an endeavor to stand still, the tractor would stop, we do not know. Presumably it would be stopped as soon as possible, because dragging the colt along the surface of the ground while lying down would nowise assist in breaking the animal.

Respondent admits that while he was present he, as owner, was in charge of the colt. Respondent contends that, when he left the Janshen ranch that evening and told Janshen that if he did not return that night Janshen should

in the morning release the colt and turn it into the pasture, his responsibility then ceased. Respondent did not return to Janshen's that night, and respondent is responsible for the condition in which the colt was left, helpless, tied to the tractor and unable to obtain water or food. There is no testimony that during the breaking operations the colt was watered. Evidently the breaking process lasted some time, and the colt was left tied to the tractor from an hour to an hour and a half while the men rounded up the cattle. It does not appear that the colt was given any opportunity to drink prior to being left tied to the tractor for the night. The colt was then lying on its side and apparently unable to rise to its feet.

Mr. Wolverton testified that, when he saw the horse Tuesday morning, it was lying with the back of its neck against the rear wheel of the tractor; that the colt merely raised its head a little bit off the ground. He further testified:

"Q. At that time, did you or did you not notice any marks in the ground where the horse's feet had been pawing? A. Yes; he had made large marks where he had throwed his feet back and forth, especially the left front foot, throwed it back and forth and wore quite a dish in the ground there."

Other witnesses testified to the holes in the ground made by the colt's feet in its struggles. One witness stated the colt had pawed two holes in the ground each about ten inches in depth. Another witness testified the holes were six to eight inches deep.

On the trial before the superior court, Mr. Wolverton testified that, when he saw the horse Tuesday morning, it was tied to the tractor by a rope leading from the tractor to the horse's halter. The record contains evidence to the effect that on the trial before the justice of the peace the witness testified that the horse was then not tied to the tractor. In response to a question on cross-examination as to whether or not he attempted to induce the horse to stand, he answered:

"A. Well, the horse—a person could see by looking at it that there was no use trying that; he didn't move his feet,

just barely raised his head a little. Q. Didn't try to get him up? A. No."

Respondent urges several contentions, which we shall discuss in order.

In the first place, he contends that the complaint is bad upon the ground of duplicity, in that matters which should have been pleaded as separate counts are joined. He argues that allegations in connection with the breaking of the horse and the allegation that respondent abandoned the horse should have been pleaded separately.

This question was raised before the trial court by respondent's oral demurrer interposed at the close of the state's case, the demurrer having been overruled. Rem. Rev. Stat., § 3187, defining the offense of cruelty to animals, is quoted above. In this section several acts are set forth which constitute the crime of cruelty to animals, the different portions of the section being in each case followed by the disjunctive *or*. Two alleged acts are charged in the complaint: First, the infliction of unnecessary pain and suffering upon the horse; and, second, failure to provide necessary care.

In the case of *State v. Pettit,* 74 Wash. 510, 133 Pac. 1014, the defendant was charged by information with the crime of grand larceny, and from a judgment of guilty he appealed. The defendant had demurred to the information upon the ground that two crimes were charged thereby. The demurrer was overruled prior to trial. Upon appeal, the appellant assigned error upon the overruling of the demurrer. Concerning this question we said:

"The information charges the crime with which the defendant is charged, with having been committed in two of the ways specified in the statute, (1) by color and aid of false and fraudulent representations, and (2) by a bailee or trustee. Does this manner of charging the crime conform to the legislative enactments? The general rule is that, where a single offense may be committed in different ways or by different means, it may be charged in the information to have been committed by more than one of the ways or means, provided the ways or means charged be not repugnant to each other.

"The varying ways by which a crime may be committed are not repugnant to each other unless the proof of one will disprove the other."

The appellant contended that, under a statute which connects the different means by which the crime may be committed with the disjunctive *or*, they cannot be joined in the information by the conjunction *and*. This court held that the contention was not well founded, and that the demurrer was properly overruled.

In the case of *State v. Murie*, 140 Wash. 71, 248 Pac. 79, we said:

"The rule is well established in this state that, under our statutes, the same crime may be charged in any or all of the ways prescribed by statute that are not repugnant to each other. . . . One or all of the series of acts constituting the crime may be charged in the same indictment or in the same information, and constitute but one offense."

The rule laid down is also supported by the cases of *State v. Mayer*, 154 Wash. 667, 283 Pac. 195, and *State v. Miller*, 164 Wash. 441, 2 P. (2d) 738.

In the case at bar, the complaint stated two separate methods by which the alleged crime was committed. These methods are in no way repugnant one to the other, and the complaint was not bad for duplicity.

■ Respondent contends that, pursuant to certain statutes of this state, the right to prosecute a criminal action based upon alleged cruelty to an animal is vested in the county humane society. The evidence shows that there was such a corporation in Yakima county. In support of his argument, respondent cites several sections of the code.

By Rem. Rev. Stat., § 3184 [P. C. § 1957], the incorporation of humane societies is provided for, the proviso reading as follows:

"Provided, that the corporate body existing at any given time and first incorporated as aforesaid in any county, shall be the only one entitled to the benefits and privileges of this act in such county."

Pursuant to § 3185 [P. C. § 1958], officers of a humane society may obtain lawful authority to prevent cruelty to

animals, and may arrest persons guilty of such cruelty. By § 3193 [P. C. § 1966], it is provided that such officers may obtain search warrants and arrest persons found violating the statute defining cruelty to animals. Section 3197 [P. C. § 1970] authorizes any member of a humane society to appear before any court of competent jurisdiction and prosecute the person charged with violation of the statute above referred to. This section also contains the following: "Provided, that all such prosecution shall be conducted in the name of the people of the state of Washington." Section 3198 [P. C. § 1971] provides for the punishment of persons convicted of any misdemeanor under the act, and that fines collected shall inure to the county humane society.

Respondent also suggests that the law does not provide for the issuance of a warrant of arrest after an act of cruelty toward an animal has been committed, basing this argument upon § 3193. By §§ 116 and 4130 [P. C. §§ 1786 and 1788], it is made the duty of prosecuting attorneys to prosecute all criminal actions to which the state or his county may be a party.

The action at bar was properly instituted and prosecuted by the prosecuting attorney of Yakima county. We find no merit in any of the arguments urged by respondent in connection with the question now under discussion.

■ Respondent argues that if any person was guilty of cruelty in connection with the breaking and death of the colt, it was Mr. Janshen and not respondent. This argument might be reasonably urged if the prosecution were based only upon events which occurred after the morning of October 28th. Respondent, as owner of the colt, was at all times present with Mr. Janshen during the attempts to break the colt on Sunday, and as owner of the animal specifically instructed Mr. Janshen as to what should be done up to some uncertain time Monday morning, when Mr. Janshen should release the colt from the tractor. Janshen testified that, when he released the colt from the tractor Monday morning, the animal raised its head, but did not get up. Mr. Wolverton stated that when he saw

the colt Tuesday morning it raised its head a little, but made no attempt to arise. Wednesday morning the colt was found dead in the same position. It is true that Mrs. Janshen testified that Tuesday morning she saw the colt standing, but the jury were not bound to accept her testimony, and, if true, it is evident that the animal lay down and died in the same spot.

▮ The court instructed the jury as follows:

"You are instructed that if you find from the evidence, beyond a reasonable doubt, the following alleged facts, you will find the defendant guilty, that is to say:

"That on or about the 25th day of October, 1942, in the county of Yakima, state of Washington, the defendant had charge or custody of the horse mentioned in the information and wilfully and knowingly inflicted unnecessary suffering and pain upon said animal by dragging it behind a tractor, thereby injuring it to such an extent that said animal could not walk, and that he abandoned said injured animal without care, thereby causing its death.

"But unless you shall be convinced beyond a reasonable doubt of the existence of said alleged facts, you must find the defendant not guilty."

Appellant complains of this instruction, and seasonably urged objection thereto, upon the ground that the word "and" preceding the words "that he abandoned," near the close of the middle paragraph of the instruction, should have been *or*. Appellant's contention upon this point is well taken, but the instruction, of course, as given, operated in respondent's favor. The jury found respondent guilty, and the verdict should stand, unless legal and valid cause to the contrary appear.

▮ The court, by the order appealed from, granted respondent's "motion for judgment notwithstanding the verdict of the jury," and dismissed the action with prejudice. In the case of *Fortier v. Robillard,* 123 Wash. 599, 212 Pac. 1083, the following rule, which has many times since been approved, was laid down:

"This court has many times heretofore announced the rule that motions for judgment *non obstante veredicto* may be granted upon motion of a defendant when there is

neither evidence nor reasonable inference from evidence upon which a verdict of the jury might rest."

■ Respondent was brought to trial upon a complaint charging him with cruelty to an animal, being the colt referred to in the evidence. Respondent makes much of the fact that, as above stated, there is no evidence to the effect that the colt while lying down was dragged by the tractor around the field. Respondent testified as follows concerning his efforts to break the colt:

"I thought, well, if I pull her a little ways, she'd get in and lead. Well, she just braced all four feet, like that (illustrating); would take two or three steps, then throw herself over on her side, with all four feet sticking straight out, just stiff. We waited for a little bit, petted her and tried to talk to her. She wouldn't do anything—just lay there. Pretty soon, took a rope to get her up; she got up on her feet and stood there. Tried to lead her; she wouldn't lead. So took the mother and tried to lead her again. I thought maybe, after leading her three or four times, she'd walk off, but she didn't do it. So, after we led her three or four times, she had her feet braced forward; she'd come forward and then jerk on the mother, on the horse I was pulling her with. There was a tractor sitting there, so I said, Well, in order to take that jolt off the horse, off the mother, I said, we'll just take a rope, put it around back of the horse, up over its back, and tie it to the tractor, and then when she jerks back, why, the tractor will take the jolt instead of the horse. So, after we done that three or four times, why, she wouldn't do nothing but fall over. Oh, we didn't do it three or four times, only done it two or three times."

Respondent argues that the method followed, as disclosed by the testimony, was nowise painful to the colt or cruel, but the jury evidently reached a contrary conclusion.

It is not disputed that, after putting the colt through the violent course of breaking disclosed by the evidence, respondent tied it to the tractor, directing Janshen to release the animal Monday morning. There is no evidence that the colt was watered during the breaking, and the record contains no intimation that the colt was watered

after respondent tied it to the tractor and departed. The fact that water was flowing in a ditch fifty feet from where the colt lay would do the animal no good if it was tied to the tractor, or if it could not arise from the ground. It does not appear that respondent made the least effort to ascertain the condition of the colt when he left it without water or food.

The court did not grant respondent a new trial, but set aside the verdict of the jury and dismissed the action. The record contains evidence which supports the verdict of the jury, and the trial court erred in vacating the same. The order appealed from is reversed, with instructions to reinstate the verdict of the jury and proceed in accordance with law.

SIMPSON, C. J., STEINERT, JEFFERS, and GRADY, JJ., concur.