[No. 39568.    Department One.    August 22, 1968.]

THE STATE OF WASHINGTON, *Respondent*, v. MILES E. PARMENTER *et al., Appellants.*\*

*Reported in 444 P.2d 680.

*Robert S. Egger,* for appellants.

*Patricia G. Harber,* for respondent.

HALE, J.—By the time Dr. Thomas reached the emergency room of Auburn General Hospital the early morning of September 27, 1966, 4-year-old Delana Davis was dead. There was nothing the doctor could do for the child, but his findings and observations initiated a chain of proceedings culminating in an information charging the foster parents of the dead child with manslaughter under the criminal code.

Filed by the Prosecuting Attorney for King County, under RCW 9.48.060 and 9.48.010, the information charged conjunctively that the Parmenters, between September 1, 1966, and September 26, 1966, struck and beat Delana, and also that, being under a legal duty to provide medical attention, they willfully failed and neglected to do so and the child, as a proximate result of all or any of said acts or omissions, died. Appealing now from a judgment entered upon a jury verdict of guilty, the defendants first present questions as to the sufficiency of the evidence to support a conviction on either or both the theories charged.

The statutes of the state impose on everyone a duty to provide medical attention for any child dependent upon him for care, education and support. RCW 26.20.030(b). Accord: *State v. Russell,* 68 Wn.2d 748, 415 P.2d 503 (1966); *In re Hudson,* 13 Wn.2d 673, 126 P.2d 765 (1942).

Although the record contains some evidence of innocence in direct conflict with proof of guilt, substantial evidence supports a verdict of guilty on each of the state's theories.

The Washington State Department of Public Assistance, March 24, 1966, placed 4-year-old Delana Davis and her

2-year-old younger brother, Jeffrey, with Miles and Ruby Parmenter for foster home care at a monthly stipend and with an understanding that the department, under its regulations, would pay all medical expenses incurred in taking proper care of the two children.

The Parmenters, along with their own children, took Delana and Jeffrey to the berry fields that summer. Three witnesses testified that they frequently saw and heard the sound of both Delana and Jeffrey being severely beaten by the Parmenters during August and September, sometimes with a berry stake. A witness said that once she saw Mr. Parmenter choke Delana. Sometimes, according to the witness, when Mrs. Parmenter was whipping the Davis children in the berry field she would suppress the sound of their cries by placing her hand over their mouths. Another witness said that practically all day, off and on, during picking hours, she could hear the children being spanked. One witness said that she picked berries in the same field with the Parmenters nearly every day from August to September 20th. She once saw Miles Parmenter whipping Delana with a berry stake along her back from her shoulder down to her knees. The witness said that the blows were so hard that the child's legs would fly out from under her.

Dr. Gordon Thomas, a physician, was summoned by telephone and testified that he arrived at Auburn General Hospital in the early hours of September 27, 1966. He examined Delana Davis and saw she was dead. Her body, he noted, was literally covered with bruises—too many, in his opinion, to come from a fall down the stairs. Bruises, he said, result from blood leaking into the subcutaneous tissue when the tiny blood vessels are broken. Usually the bruises come from an external force. In his opinion, any layman would earlier have recognized the need for immediate medical attention. Had the child received prompt, professional medical attention, in Dr. Thomas' opinion, her chance of survival would have increased because, with transfusion, intravenous therapy and supporting care, effects of blood loss from interior bleeding could have been moderated.

Dr. Gale Wilson, Chief Pathologist for the King County Coroner, who, in his professional career, had performed 15,124 autopsies while serving in that capacity, performed an autopsy on the body of Delana Davis the morning of September 27, 1966. He counted 35 separate and distinct bruises about her head and face. The body had additional bruise marks on the right forearm and arm, the right thigh and leg, the inside of the left thigh and leg, the left arm and forearm, and around the left elbow area. More bruises were found on the left side of the lower abdomen and the upper thigh and leg. There were so many bruises on the child's back that Dr. Wilson could not count them all because of overlapping. Altogether, he "counted up to one hundred and fifty total, and gave up."

The bruises were of varying ages. He could tell this by their different colors. He said that, shortly after a blow is struck, a person develops a little swelling that turns black and blue. In a few days, the color changes to become darker, then more blue, then green and then yellow before it fades away.

Of the bruises on the child's face—contusions as he described them—some were less than 24 hours old and some 3 or 4 days old. Extensive bruises on the left hip were 7 to 10 days old. Bruises on the inner surfaces of the thighs, he said, were not the type one gets from a fall—but from being struck by something, as a rounded object. He also observed two pinch marks on the child's body. Many of the bruises indicated to the doctor that they were caused by blows and not from falls. Falls down a stairway, he said, produce a certain amount of skinning or abrasions, whereas bruises could result from direct hits where the patient is not in motion.

Immediate cause of death, said Dr. Wilson, was a subdural hemorrhage occurring beneath the dura mater which lines the skull and the brain, resulting from a fracture of the occipital area of the skull. There were, he believed, two skull injuries, the second one starting the bleeding afresh and ultimately causing the child's death. Immediate medi-

cal attention after the first injury or even following the second injury, would have increased the child's chances of survival. Both Dr. Thomas and Dr. Wilson said that the child's chances of survival would have increased had medical attention been given her right after either head injury.

Subdural hemorrhage, said Dr. Wilson, is caused when vessels on the surface of the brain are injured. Because the brain is in a closed space, confined by the skull, the bleeding displaces normal fluid surrounding the brain. Pressure from the body's circulatory system is greater than the normal pressure on the brain, so a hemorrhage on the top or side pushes the brain down. When a hemorrhage is suspected, the treating physician will drill into the skull and probe for blood or trim down a flap of bone and aspirate or draw off the blood to relieve the pressure.

Dr. Wilson described the fatal injury as a hemorrhage over both sides of the brain and between the dura and the brain and also under the arachnoid layer in the right frontal area—the latter being what he called a contrecoup type of injury, indicating that the head was in motion when struck forcibly. In the countrecoup, or counter blow, the brain hits against the point of injury and "then it rebounds and hits on the front side, causing the secondary injury."

The injury occurred, he said, 24 to 36 hours before death with fresh bleeding just before death. Cause of death, he said, was a skull fracture creating a large hematoma or blood clot under the scalp extending completely around the back of the skull to mid-temple on both sides. Although the hematoma could not be seen, it could easily be felt as a soft swelling under the scalp, covering nearly two-thirds of the head.

Within a few hours of such an injury, Dr. Wilson said, the patient generally has difficulty focusing the eyes; the eyes may cross or one only may turn out or up. Generally there is headache, dizziness and very often projectile vomiting. He said that a child, on suffering the initial blow, would probably show apparent symptoms—drifting off to

sleep or not wanting to eat—and that the child would not appear normal to anyone who was used to it.

As to the child's ability to walk and her agility before the fatal injuries, Dr. Wilson found no abnormalities or deformities in her legs or knees, and noted that her legs were of the same length and size.

There was evidence, too, that Delana's younger brother, Jeffrey, had bruises on both arms, buttocks, lower back and chest on the day of Delana's death—this evidence coming from a Vivian Peterson, who acted as a babysitter for the Parmenters that morning, and from a medical doctor who examined Jeffrey 2 days later.

Another witness, Mrs. Nelson, who had taken care of Delana and Jeffrey Davis from January 14th to March 24, 1966, said that neither child had difficulty climbing stairs and that she observed nothing wrong with Delana's vision or ability to walk or climb stairs. Both children, when she had taken them to a bowling alley once a week, climbed the 26 stairs there without difficulty.

Thus, at the close of plaintiff's case, there was evidence that a 4-year-old child was brought to the hospital dead; the body showed the marks of over 150 bruises, many of which could not have been caused by a fall but instead from blows made with a hard, rounded object; the immediate cause of death was a hematoma or bleeding under the scalp caused by a subdural hemorrhage and aggravated by a second skull injury; and that blows on the child's head, face and body could have caused, or so aggravated the skull injury, as to produce death. There was evidence, too, that the dead child's younger brother, who was also under defendants' care, showed bruise marks from beatings with a stick.

The Parmenters, in defense, produced testimony that Delana was clumsy, stumbled and fell frequently and that her feet were too large for a 4-year-old child. They took the children to the berry field and, when they thought it appropriate, did discipline them, but neither ever struck the children other than with the hand. They said they had

never struck either child with a berry stake or lath. They produced evidence that they were truthful persons, regular in their church attendance, and that they took good care of their own children. Witnesses, who came to their house frequently, said they saw no indication that either Delana or Jeffrey had been mistreated by the Parmenters and that Jeffrey appeared happy and relaxed when with Mr. Parmenter in the home. These witnesses said that Delana seemed to accept Mrs. Parmenter as her mother and that the Parmenters treated the Davis children no differently than they treated their own.

Mrs. Parmenter said that when Delana and Jeffrey were first placed with them by the welfare department, Jeffrey "had a terrible rash, sores, on his body and head;" Delana had a problem, too—she was extremely clumsy and fell down frequently. Mrs. Parmenter said that, when she took the children to their own family doctor about these conditions, he treated Jeffrey and told her to observe Delana closely for a while to see if she overcame her awkwardness. She took the children to the berry fields because she thought it time for her own 9-year-old son to learn to earn money, but he was too young to go to the berry fields alone. She said she did spank the children there, her own child included, but only with her hand.

Directing her testimony to Delana's first fall on the stairs, she said that it was about 10 o'clock in the morning, Saturday, September 24th. Mrs. Parmenter was in the dining room and Mr. Parmenter outside the house. She heard Delana fall and she saw that Delana had come near the bottom stair by the time Mrs. Parmenter could reach her. Mrs. Parmenter testified that she helped the child up, asked her if she was hurt and the child said "No." The only sign of the fall Mrs. Parmenter could find was a mark or abrasion under the child's chin, which Mrs. Parmenter washed. During the rest of the day, according to Mrs. Parmenter, the child "appeared as usual. She ate her lunch and she ate dinner." She did not complain of a headache or anything else and did not appear sleepy, nor did she take a nap that

afternoon. Next morning, Sunday, Mrs. Parmenter noticed nothing unusual about Delana and took her to church where Delana attended Sunday school. The child, said Mrs. Parmenter, showed no unusual symptoms or traits that Sunday.

Monday, however, she said Delana again fell on the stairs in the Parmenter house. It was about 6 o'clock in the evening. Mrs. Parmenter was ironing in the dining room and the other children were watching television in the living room when she heard a noise as though someone were falling. By the time she moved to where the stairway came into view, she could see Delana falling on the stairway— she saw her fall all the way down to the floor.

Mrs. Parmenter testified that she ran to the child, picked her up and then sat on the step with her; that the child looked pale, "and I thought I would take her outside, and when I started to go with her she heaved. She just kind of spit up." Mrs. Parmenter had to pick up her husband at his work at about 7:30, so she gave Delana a bath. She noticed then that the child had bruises on her face and body. She dressed Delana in her bathrobe and pajamas and took Delana and her own children in the car to pick up Mr. Parmenter. In the car, the child seemed pale and sleepy on the return drive. At home, Mrs. Parmenter put the other children to bed. Mrs. Parmenter said that Delana still acted sleepy when they got home so the Parmenters decided to keep the child close to them that night. They first put her on the couch and nearby put a mattress on the floor for their own bed. Then, since they were afraid the child might fall off the couch, they had her sleep on the floor mattress between them.

During the night, Mr. Parmenter awoke and awakened his wife. Here is her testimony describing what happened:

Q. How were you awakened? A. By my husband calling me. Q. What did he say? A. He was calling, "Ruby, something has happened to the baby. She doesn't look right." And I raised up and I said to get some help. And I just started in giving mouth to mouth resuscitation. Q. You told your husband to get some help? A. Yes. Q.

What happened when you tried mouth to mouth resuscitation? A. I think the first time I breathed in she breathed down, just heaved, gurgled. And he brought some paper towels and cleaned us up; but I just kept breathing, trying to keep her breathing.

Mrs. Parmenter said that they called the fire department immediately, and a crew arrived to give artificial respiration while taking Delana to the hospital. She said that not until her husband awakened her after the child's second fall—although the idea did cross her mind—did she feel it necessary to call a doctor; Mrs. Parmenter testified that following the fall she gave Delana the same treatment she would have given one of her own children.

We think this summary of the evidence answers the contentions that the state failed to produce substantial evidence either that the death of the child resulted from blows and mistreatment or from withholding of medical care or from both such causes.

There was evidence from which the jury could infer that (1) both children had been beaten with a stick repeatedly; (2) numerous bruises on the deceased child's body could not, from their shape, size, coloration and location, have been produced by a fall down a stairway; (3) the child had been struck and bruised after the reported fall on Sunday; and (4) the skull fracture could have been produced by shoving the child's head against a hard object or in a fall down a stairway, and innumerable bruises on the child's face and body which could not have been produced by a stairway fall were readily discernible to a layman. And, of course, the record shows ample proof of the child's obvious need for medical attention and of the defendants' failure to provide it. There was, therefore, sufficient evidence to support a jury's finding of guilty as to each or both of the means charged in the information.

One other assignment of error argued merits discussion. At the conclusion of plaintiff's case, defendants moved to require the plaintiff to elect which one of the alternative theories of commission it relied upon for a conviction. The motion was denied by the trial court.

■ An information should contain a statement of the acts constituting the offense concisely set forth in ordinary language without repetition in such a way as to enable a person of common understanding to know what it means. RCW 10.37.050(6), 10.37.052(2). Since many crimes are committable in more than one way, the information may properly charge several acts which constitute a single crime. That is, if the statute sets forth several ways of committing a single crime, the information may specify several ways in which the crime is charged to have been committed. *State v. Holedger,* 15 Wash. 443, 46 Pac. 652 (1896); *State v. Elswood,* 15 Wash. 453, 46 Pac. 727 (1896). An information charging the commission of an offense in several different ways is good if any one of the charges is good. *State v. Hull,* 182 Wash. 681, 48 P.2d 225 (1935).

Thus, two distinct, but closely related, rules apply: (1) One or all of a series of acts which constitute but one offense may be charged in the same information or indictment in a single count; and (2) where an offense may be committed by different means, an indictment or information may charge in one count all means that are not repugnant to each other. *State v. Scott,* 64 Wn.2d 992, 395 P.2d 377 (1964); *State v. St. Clair,* 21 Wn.2d 407, 151 P.2d 181 (1944); *State v. Severns,* 13 Wn.2d 542, 125 P.2d 659 (1942). That these are the prevailing rules in this country is evident from a reading of *State v. Brunn,* 145 Wash. 435, 260 Pac. 990 (1927) and 5 Wharton'~ Criminal Law and Procedure § 1932 (1957 ed.) at 31.

■ Repugnancy, of course, among the means of committing the offense charged, depends on opposites. If a single offense can, under a criminal statute, be committed in different ways or by different means, the several ways or means charged in a single count are not repugnant to each other unless proof of one disproves the other, and a conviction may rest on proof that the crime was committed by one of the means charged. *State v. Carlson,* 50 Wn.2d 220, 310 P.2d 867 (1957).

■ The two means charged were not repugnant to each other. The information charged but a single crime of man-

slaughter committed, as earlier noted, in two ways: the defendants, between September 1, 1966, and September 26, 1966, "unlawfully and willfully did strike, beat and otherwise assault Delana Davis . . . and the said defendants, then and there being under a legal duty of providing medical attention to the said Delana Davis . . . did then and there unlawfully and wilfully fail and neglect to provide said Delana Davis with medical attention . . . as a direct and proximate result of all or any of the said acts and omissions, the said Delana Davis . . . died." Obviously, proof of beatings administered to the child did not tend to disprove need for or failure to supply medical attention. Nor is the converse true. Accordingly, we find no repugnance between the two means of manslaughter charged here and the court did not err in refusing to require an election as to which means the state relied upon.

Defendants contend, too, that want of repugnancy between the means charged does not make the information good because the verdict of guilty of one count of manslaughter does not indicate whether the jurors were unanimous as to which means the defendants were convicted of, and that the court has no means of ascertaining if the verdict was unanimous. This argument, we think—once the problem of repugnancy had been resolved—is fully answered by instruction No. 15 in which the court told the jury that its verdict must be unanimous as to either the first, or second, or both means charged,[1] and that a reasona-

---

[1]"To convict either defendant of the crime of manslaughter as charged in the information, the state must prove to you beyond a reasonable doubt:

"(1) (a) That on or about the 1st day of September 1966, to and including the 26th day of September 1966, the defendants unlawfully and willfully did strike, beat and otherwise assault the said Delana Davis, a human being;

"Or

"(1) (b) That the defendants had a legal duty to provide medical care for Delana Davis on or about the 1st day of September 1966, to and including the 26th day of September 1966, and that during that

ble doubt as to either or both means required a verdict of not guilty. We see no basis in the record for assuming that the jury did not follow the court's instruction.

Consideration of the other assignments of error leads us to conclude that they are without merit. Accordingly, the judgment is affirmed.

FINLEY, C. J., ROSELLINI and McGOVERN, JJ., and ARMSTRONG, J. Pro Tem., concur.

---

period of time the defendants *willfully* omitted to furnish necessary medical attendance to the said Delana Davis;

"(2) That as the proximate result of said act or acts, or omissions, the said Delana Davis languished and died;

"(3) That said act or acts or omissions occurred in King County, Washington.

"If you find from the evidence in this case that the state has proved beyond a reasonable doubt elements (2) and (3) and either (1) (a) or (1) (b), or both, then it will be your duty to return a verdict of guilty of the charge of manslaughter as charged in the information. I expressly point out that before you can return a verdict of guilty, all twelve of you must agree that element (1) (a) has been proved, or that all twelve of you must agree that element (1) (b) has been proved, or both.

"On the other hand, if after weighing all the evidence and lack of evidence you then entertain a reasonable doubt as to the establishment of the foregoing elements as above referred to, then you should return a verdict of not guilty."