[No. 31005. Department One. January 13, 1950.]

THE STATE OF WASHINGTON, *Respondent*, v. LEONARD B. JEANE, *Appellant*.[1]

[1] Reported in 213 P. (2d) 633.

*George N. Apostol,* for appellant.

*John Hancock,* for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment and sentence following a verdict of guilty by a jury on a charge of grand larceny. The defendant was charged under two counts, involving different transactions. The jury found the defendant not guilty as to count II, and we shall not concern ourselves further with that charge. Count I alleged:

"Comes now John Hancock,. the duly elected, qualified and acting Prosecuting Attorney of Okanogan County, Washington, and by this Second Amended Information accuses the defendant, Leonard B. Jeane, in Count I thereof, with the crime of Grand Larceny, committed as follows, to-wit:

I.

"That he, the said Leonard B. Jeane, in the County of Okanogan, State of Washington, on or about the first day of October, 1947, by color and aid of a check in words and figures as follows, to-wit:

"Twisp, Washington   10/1/1947   No. 3
Commercial Bank
Twisp, Washington

Pay to the
  order of      BOB'S LOCKER SERVICE...............$ 30.00
Thirty and no/100..............................Dollars
                      Leonard B. Jeane
                      Endorsed:  Bob's Locker Service
                                 D. Hawkins
did willfully and unlawfully and fraudulently then and
there obtain from one Robert Hawkins, the proprietor of
Bob's Locker Service at Winthrop, Washington, lawful
money of the United States and merchandise of the value
of thirty dollars ($30.00), the property of Robert Hawkins,
with intent to deprive and defraud the said Robert Hawkins
thereof, and, the said Leonard B. Jeane then and there
knowing that he had not sufficient funds in said depository
to meet said check upon presentation, and that he was not
authorized and entitled to draw the same, all contrary to
the form of the Statutes in such cases made and provided
and against the peace and dignity of the State of Wash-
ington."

The testimony showed that on the morning of October 1,
1947, the defendant deposited $11.80 with the Commercial
Bank of Twisp. This was the only deposit which he made
at the bank. Duplicate deposit slips were made, the carbon
copy being given to the defendant. During the noon hour
of that day, the defendant went into a store in Winthrop,
known as Bob's Locker Service, and purchased a leather
vest. It was valued at thirty dollars (the value being testi-
fied to by the proprietor and the clerk), and the defendant
gave the store a check on the Commercial Bank of Twisp
for thirty dollars and took the jacket. Upon being asked
for identification, he produced the duplicate deposit slip
showing a deposit that morning of $111.80. When presented
for payment the check was returned "N.S.F.". Subsequently
the defendant was arrested, tried, and convicted.

Appellant assigns the following errors: prejudicial mis-
conduct of the prosecutor in waving some incompetent
checks before the jury; in allowing certain exhibits to be
admitted in evidence; in permitting the prosecutor, when

cross-examining the defendant, to go beyond the scope of the direct examination; in permitting the accused to be compelled to testify against himself; and in excluding testimony of an expert witness offered by the defense.

At the trial, the state offered as exhibits the two checks involved in the two counts, and the original and duplicate deposit slips. These were admitted without objection. Certain other checks were then offered which had been drawn on the Commercial Bank of Twisp as a result of the deposit of $11.80, and negotiated to various people in the area. In passing, we may say that these are the checks which the prosecutor is accused of having waved before the jury. The trial court admitted three checks, all dated October 1, 1947, two for twenty dollars and one for ten dollars. Other checks were refused because not properly identified. Appellant objected to the introduction of all of these checks on the ground that they were evidence of other, independent crimes.

Appellant relies upon the early case of *State v. Bokien*, 14 Wash. 403, 44 Pac. 889. There, the accused was tried and convicted of the charge of obtaining property by false pretenses, by representing that he had a right to issue a bank check in payment for such property when in truth and fact he had no right or authority to issue the check. Upon the trial, the court permitted the state to introduce, over objection, several checks drawn by the defendant, prior to the date of the one in question, and to prove that they had been presented to the bank and payment refused, because the defendant had no funds on deposit. Upon appeal, this court held that the evidence was not competent to prove the intent of the defendant in the particular transaction, for the reason that it would not logically follow that he intended to defraud the prosecuting witness because he had defrauded other parties at various times previously. We said:

"Moreover, in this instance, the question of criminal intent, or guilty knowledge, was not in issue, for at the very threshold of the trial the defendant admitted that he signed the check in controversy; that he delivered it to Sharick,

and got from him the pitcher, and that he then had no money in bank to meet it; and, at the same time, he gave notice to the prosecution, through his counsel, that he expected to prove that he never made the pretences and representations alleged in the information, but, on the contrary, expressly stated to the prosecuting witness, Sharick, when he delivered the check, that he then had no money in the bank but would have soon, and that the check would then be paid; and he so testified in his own behalf, and his testimony was corroborated by other witnesses. There was, therefore, really but one question for the jury to determine, and that was whether the defendant did or did not make the statements imputed to him, and hence all of the evidence in regard to the giving of other checks was absolutely foreign to the case, and therefore inadmissible upon any theory or rule of evidence."

In the present case, the following occurred at the time objection was made to the admission of these other checks:

"THE COURT: I understand from your statement that you are stipulating or conceding that these checks that have been introduced in evidence were given by the defendant with knowledge on his part that there was not sufficient funds in the bank to cover those checks and he knew that at the time he gave them.

"MR. APOSTOL: I am not conceding it was with knowledge on his part. I am conceding they went to the bank and the bank declared them 'N.S.F.' I am not conceding that he had knowledge of it at the time that he wrote them."

It is apparent that the situation here is entirely different from that in the *Bokien* case. There, the question of intent was not in issue. Here, the appellant was charged with grand larceny, in that he fraudulently obtained property of the value of over twenty-five dollars, with intent to deprive and defraud the owner thereof, by color and aid of a check, knowing that he did not have sufficient funds in the depository to meet the check upon presentation.

Intent is an essential element of the crime charged. Any evidence which would assist the jury in determining whether or not he had an intent to defraud, would be relevant.

■ In *State v. Edelstein*, 146 Wash. 221, 262 Pac. 622, we said:

"Evidence . . . does not become irrelevant or incompetent, merely because it also tends to show that the accused has committed another crime, unrelated to the one for which he is being tried."

The rule is stated in 22 C. J. S. 1100, Criminal Law, § 686:

"As a general rule, evidence of other offenses committed or attempted by accused is admissible to show, or when it tends to show, his criminal intent or purpose with respect to the offense charged, as tending to show his guilt thereof, and proper evidence which proves or tends to prove the particular intent is not to be excluded because it incidentally discloses the commission of an independent crime by accused, or an attempt or threat to commit one. . . . Where the question is whether a certain act was intentional or was done by accident or mistake, in good faith, evidence to show that accused had committed similar acts is relevant to show the intent."

■ The checks in question all stemmed from the deposit in the bank of $11.80. They all related to the two checks under which appellant was being tried. Appellant was not compelled, as the defendant was in the *Bokien* case, to acquit himself of several distinct offenses. The question of his intent to defraud was in issue, and it was not error for the trial court to admit in evidence the three checks in question.

With reference to the assignments of error of improper cross-examination and self-incrimination, the record shows that the appellant's entire direct examination consisted of the following testimony:

"Q. Showing you what has been marked as Defendant's Exhibit No. 17, will you tell me what that is? A. That is the vest that I received from Bob's Locker Service. Q. That is the vest that you received from Bob's Locker Service? A. Yes. Q. That was for the check you gave? A. Yes."

Under cross-examination, the following occurred:

"BY MR. HANCOCK: Q. At the time of your arrest did the sheriff ask you what had become of the jacket that you obtained from Bob's Locker Service? A. He didn't at the

time of my arrest. Q. Did he at any time after that? A. After I was sentenced and tried he did. Q. Did you tell him where this jacket was? A. No, I didn't tell him. Q. Did you make any statement as to what had become of it? A. All I told him—he asked, 'What did you do with that jacket?' I said, 'Well, I don't know. I might have sold it or I might not.' That is what I told him. Q. How much did the jacket cost?

"Mr. Apostol: If your Honor please, I put the defendant on the stand for the purpose of identifying this exhibit. The question asked by the Prosecuting Attorney is going beyond the scope of the direct.

"Mr. Hancock: He is asking about the jacket that he got over at Hawkins store. Apparently this is all the testimony this witness is going to give. I should have an opportunity to cross-examine him.

"The Court: The objection is overruled.

"Mr. Hancock: Q. How much did you pay for that jacket? A. He charged me $30.00 for it. Q. How did you pay for it? A. With a check. Q. Did you have money in the bank at the time that you gave him that check to pay for it? A. I didn't have enough funds to cover the check. Q. And you knew you didn't have enough funds, didn't you? A. I was drunk. Q. What was the total amount of money that you had in the bank to cover these checks? A. $11.80. Q. $11.80. Did Mr. Hawkins ask you for any identification— Mr. Leedy I believe it was that took your check. Did he ask you for any identification at the time that he accepted the check? A. All I had was my bank deposit slip. He didn't come right out and ask me for identification. If he seen it, he seen it right there and took it for identification. Q. Showing you State's Exhibit No. 2, is that the deposit slip you showed Mr. Leedy at that time in order to get him to take your check? A. Yes. Q. That shows you had on deposit in the bank, what amount of money? A. It says $111.80. Q. Showing you State's Exhibit No. 5, do you know what that is? A. That is the deposit slip in the Commercial Bank of Twisp for $11.80, isn't it? Q. Is that all the money you ever deposited in the Commercial Bank at Twisp?

"Mr. Apostol: If the Court please, Mr. Hancock, the Prosecuting Attorney, is going far beyond the scope of the direct examination and I renew my objection.

"The Court: The objection will be overruled.

"Mr. Hancock: Q. Was that all the money that you had on deposit in that bank or ever had in it? A. $11.80. Q. That

is all? A. Yes. Q. How soon after you made that deposit was it that you were up to Winthrop giving this check to Hawkins for this jacket? A. I don't remember. Q. Was it that same day? A. Yes. Q. Had you written some other checks before you gave this to Hawkins' store? A. I might of. I don't know. I don't remember. Q. All right, you knew when you wrote that check that $11.80 was not going to cover a $30.00 check, didn't you? You knew that and you knew when this check was presented to the bank it would not be paid, didn't you? A. Yes. Q. Now on this same day, the 1st of October, 1947, you gave a check in the sum of $20.00 to the Trading Post at Winthrop. Do you recall giving that one? A. I don't know whether it was before the other one or after. Q. Showing you what has been marked Exhibit No. 3 for identification, do you know what that is? A. It says here, the first one— Q. What is Exhibit No. 3? A. A bank book. Q. Is that the one you had? A. No answer. Q. I want you to answer me and not look at your counsel. Did you make these entries in there at the time that you wrote those checks? A. Yes. Q. How many checks had you written on this deposit in the Twisp bank prior to the time you gave the $30.00 check to Hawkins store? A. No answer. Q. Talk to the jury and not to your attorney. How much do they total? A. $30.00 I think. That was three checks. Q. Then you certainly knew you did not have sufficient funds to meet these checks upon presentation and it was your purpose and intent to defraud this man out of his merchandise when you gave him the $30.00 check, wasn't it? A. No, I would have made that check good if I would have had the chance. Q. On that particular day you had written two other checks of a total of $30.00 and you knew that those could not be covered when they were presented, didn't you? A. Yes. Q. Yet, you go ahead and write this other one and you say you intended to make it good? A. That is right. Q. Did you write others on this same deposit after that? A. I wrote some I think. Q. Now showing you what has been marked State's Exhibit No. 8 for identification, do you know what that is? A. That is a check. Q. Who wrote it? A. I did. Q. And who did you give that to? A. Over a poker game. Q. What date did you give that? A. The night of the 1st. Q. Showing you what has been marked State's Exhibit No. 12, do you know what that is? A. Yes, one of my $10.00 checks. Q. What day did you give that? A. The same day. Q. That is on the 1st of October, and do you know who you gave that one to? A. It says the

Smart Shop. I don't remember where that Smart Shop was. Q. Do you know when you gave that Exhibit No. 4 which has been admitted in evidence? A. The morning of the 2nd of October. Q. Did you have the money in the bank to cover that one? A. No. Q. That is the $50.00 one, isn't it? A. Witness nods his head. Q. Showing you this Exhibit No. 11 for identification, do you know what that is? A. That is one of my checks. Q. Where did you give that check? A. It says to a man by the name of Eastman. Q. What did you give him that one for? A. He called the bank to see if it was good. Q. You knew at the time you gave it that it was not good, didn't you? A. Yes. Q. And it was your purpose and your intention to defraud this man, Hawkins of his merchandise when you wrote this check, and that was your intent when you started writing these checks after depositing that $11.80? A. Well, I wouldn't say it was for the purpose of defrauding. Q. Why did you change $11.80 to $111.80 on the deposit slip? A. I don't know. Q. Do you remember showing it to the man when you wanted him to cash your check? A. It was laying on the counter. It was there. When I took it out I laid it down there where he could see it. Q. You definitely remember you didn't hand it to him, you laid it down and he could see it? A. He could see it where it was laying. Q. If you can remember that much at the time you cashed the $30.00 check, you certainly remember when you changed the $11.80 to $111.80 don't you? A. I said I don't remember. Q. But you remember this was out of your pocket and laid out there where Leedy could see it when he cashed your check, and you stated that the agreed price you were to pay the man for this jacket was $30.00, is that right? A. That is right."

It will be noted that appellant's counsel made but two objections on the ground that the cross-examination had gone beyond the scope of the direct.

■■■ It is the general rule in both civil and criminal cases that the cross-examination of a witness is limited to the scope of the direct examination. Within its discretion, the trial court can grant considerable latitude in cross-examination. When a defendant in a criminal case takes the stand, he is subject to all the rules relating to the cross-examination of other witnesses; see Rem. Rev. Stat., § 2148 [P.P.C. § 127-1].

■ Here, the defendant took the stand and opened up the transaction of the sale of the jacket and the issuance of the check. We are satisfied that the questions objected to by appellant's counsel were within the scope of the direct examination, and, therefore, the trial court committed no error in overruling the objections.

From that point on, no further objections were made and no motion was made to strike any of the testimony. Counsel for appellant states in his brief that the court instructed him that he should not take exceptions, that it was not necessary in order to preserve the record. This is what occurred:

"THE COURT: You may state your objections when the offer of proof is made. I may state to counsel further it is not necessary in order to preserve your record, that you take an exception. That is automatic as to any evidence that is introduced over objection."

■ Subsequent to the rulings by the court on the two objections in cross-examination, the prosecutor did go beyond the scope of the direct examination when he succeeded in having the appellant identify certain exhibits which the state had not been able to have admitted in its case in chief because of lack of proper identification. In giving this testimony, the appellant not only gave evidence against himself as to the offenses charged in the information, but incriminated himself in that his answers exposed him to the possibility of being charged with the commission of other crimes. Though this line of questioning was beyond the scope of the direct, counsel made no objections on that or any other ground. Hence, appellant cannot urge this issue for the first time on appeal.

However, appellant earnestly contends that there was an invasion of his constitutional rights. This contention poses the question: Was the line of questioning under consideration a violation of Art. I, § 9, of the state constitution, which provides that "no person shall be compelled in any criminal case to give evidence against himself"? The answer depends upon whether the constitution confers upon

an accused person an absolute right which cannot be waived, or merely a privilege which he may or may not invoke. The language of this section clearly indicates that the constitution grants a privilege. The use of the word "compelled" connotes that the accused must be forced to testify against his will, that the testimony is exacted under compulsion and over his objection.

The constitution does not prohibit the reception of such evidence. It simply provides a safeguard of which the accused may or may not take advantage. Should he, having taken the stand, voluntarily give evidence against himself, as by confession or admissions, he thereby waives his privilege. Or should he, under cross-examination, answer incriminating questions without claiming his privilege and with no objections from his counsel, he similarly waives his privilege. See 3 Wharton's Criminal Evidence 1982, Witnesses, §§ 1144, 1145. Provisions similar to Art. I, § 9, are found in the Federal and nearly all state constitutions. These provisions have been interpreted in 14 Am. Jur. 870, Criminal Law, § 144, as follows:

"The right is not merely a formal technical rule, which may be enforced or dispensed with at the discretion of the courts. It is a mandatory, constitutional provision, securing to every defendant a valuable and substantial right. It is nothing more than a statement of the common-law rule of evidence and guarantees no greater privilege than that all persons shall be free from compulsion by legal process to give self-incrimininating testimony."

In the present case, the appellant, having taken the stand, thereby subjected himself to all the rules of law relating to cross-examination of other witnesses. During his cross-examination by the prosecuting attorney, appellant incriminated himself and gave evidence against himself. But since appellant did not claim his constitutional privilege and since his counsel neither objected to the testimony under consideration nor later moved to strike the same, the privilege was waived. He therefore cannot now complain about any invasion of his constitutional privilege against self-incrimination.

This guaranty of immunity from self-incrimination is placed in the constitution for the benefit of the accused, and should not be regarded lightly by the courts. Occasions could arise where it would become the duty of the court on its own motion to advise the accused as to his rights, such as, for example, where he is not represented by counsel, or where, through inadvertence or otherwise, his counsel has failed to assert the privilege. But here the appellant was represented by counsel who was alert and who fought for his client at every opportunity. Furthermore, the record discloses that the trial court was extremely careful to afford to the appellant every right to which he was entitled. We find no error on the part of the trial court in this regard.

Fred Walter, an expert witness for the defense, was asked to testify as to his opinion of the value of the leather jacket, which testimony was refused by the trial court. Mr. Walter was a buyer of ladies' ready-to-wear goods and had been in men's clothing business from 1911 to 1919. The court allowed a great latitude in the attempt to qualify the witness, and it was not an abuse of discretion to refuse to permit him to give opinion evidence.

The judgment and sentence is affirmed.

SIMPSON, C. J., BEALS, GRADY, and DONWORTH, JJ., concur.