[No. 40474. En Banc. May 28, 1970.]

THE STATE OF WASHINGTON, *Respondent*, v. WALTER SCOTT GOLLADAY, *Appellant*.*

*Reported in 470 P.2d 191.

Reed & Gallup and Edward P. Reed, for appellant (appointed counsel for appeal).

R. DeWitt Jones and Robert L. Harris, for respondent.

NEILL, J.—The defendant is charged with first-degree murder committed (1) by premeditated design to effect death, (2) by homicide occurring during the commission of or withdrawing from the scene of a rape, or (3) by homicide occurring during the commission of or withdrawing from the scene of a larceny. He appeals from conviction and life sentence.

The assignments of error challenge admissibility of evidence, exclusion of prospective jurors opposed to capital punishment, and sufficiency of the evidence as to rape-murder and larceny-murder.

On January 20, 1968, the body of Enid McGlothlin was found lying near a dirt road in a remote section of Clark County in the vicinity of Camp Bonneville in an area characterized by one witness as a "lover's lane." The body was nude, except for stockings. The victim's clothing was strewn in the general area. A brown coat and chain belt appeared to have been ripped from the victim. Her dress

and brassiere were torn apart at the seams. Her panties were found, but her slip, shoes and purse were not at the scene. The victim's damaged wrist watch was stopped at 11:56.

A pathologist called to the scene observed that the heels of the victim's stockings were covered with grass, dirt, and some black foreign material, similar to material on the floormat of defendant's automobile. However, the soles of the stockings were "relatively clean." He also testified that there were no "skid marks or evidence of dragging of the body."

The pathologist testified that there were heavy bruises on the hands which, in his opinion, resulted from defensive action by the victim. The body bore facial wounds, an abrasion on the inside of the left thigh, and bruises about the breasts. Several wounds were found on the back of the head, which resulted in extensive hemorrhaging. It was his opinion that the blows were made with a blunt instrument having a rounded surface, and that the head injuries caused the death. He estimated the time of death at about midnight, January 19, 1968.

The victim and her husband lived in Portland, Oregon. They had gone to Washougal, Washington, on Friday afternoon, January 19, 1968, where they spent some time in a tavern. They proceeded to Camas where they were seen quarreling at about 10:30 p.m. The two separated, Mrs. McGlothlin stating that she was going to take a taxi home.

Between 10:30 and 11:30 p.m., at least eight witnesses saw a woman, similar in description and dress to the victim, on the streets of Camas. Several witnesses testified that the woman was with a tall, thin man. The victim's husband does not fit this description. This woman and a tall, thin man were seen squabbling at about 10:40 p.m. At approximately 11 p.m., witnesses saw a woman and a man arguing. These witnesses described the woman as being about 5 feet tall and wearing a brown coat with a dark fur collar, thus fitting the victim's description. She was staggering and appeared to them to be under the influence of liquor. The man was described as dark, tall, and thin. He

was not Mr. McGlothlin, who was known by two of the witnesses. Several witnesses testified that the man was making advances toward the woman.

Between 11 and 11:30 p.m., two boys saw the same woman staggering along Sixth Street in Camas. She was alone, walking through mud and debris on the sidewalk. She was seen turning and looking back "as if she were looking for someone." The boys passed the woman and proceeded to their homes. Another witness confirmed seeing a lone woman with two boys walking behind her at about 11:30 p.m. on Sixth Street. Thus the victim, or someone looking like her, was last seen walking west on Sixth Street in Camas about 11:30 p.m.

It is at this point that the defendant enters the picture, for he admits picking up Mrs. McGlothlin about 11:30 p.m. on January 19, 1968, but contends that she was accompanied by a tall, thin man.

Defendant had lived in Camas with his parents for about 1 year. About 6:30 p.m. on January 19th, he met three companions—Tom Baldwin, Robert Pearson and Ben Franklin. The four young men drove from Camas to Portland in Baldwin's car. In Portland they went to a house where a prostitute was reputed to live. The defendant knocked on the door of the house, but no one answered. According to defendant and his companions, this was done for Franklin's benefit as a joke. The boys thereupon left, drove to Lloyd Center, bought some ale, and proceeded to an apartment in Vancouver where a party was in progress. They left the party at 9:30 p.m., and visited a dance at Clark College where defendant had been a student. They left the dance around 11:15 p.m., and drove to Camas. During the ride to Camas, defendant told the other boys that he intended to return in his own car to another party in Vancouver. Upon arriving in Camas, Baldwin took defendant home. This was approximately 11:30 p.m.

Defendant was next seen about 45 minutes later several miles from Camas at a road intersection about 3 miles from where the victim was found. He had failed to negotiate a corner with his automobile and struck an embankment.

Witnesses at the scene testified that defendant was bleeding extensively from a head wound and that he showed signs of having suffered a concussion and of being intoxicated. Defendant identified himself several times and told the witnesses he was coming home from a party and needed help in extricating his car from the ditch. One of these witnesses observed a woman's purse, the spilled contents of the purse, and a pair of woman's shoes on the floor of defendant's car on the passenger side. Defendant flipped the shoes from the automobile, saying he didn't need them. Then he placed the contents back in the purse, carried it into a nearby field, and returned without it. Defendant stated he wanted to rid the car of anything that might cause him trouble, because he was under age, had been drinking, and had a wreck. He threw a can of ale into a roadside field. He also gave one of the bystanders a small caliber gun and ammunition clip for safekeeping. He repeatedly searched the car for a tape-wrapped pipe which he said he carried in the car for self-protection. The pipe was never found. There was testimony that the pipe had been removed from the automobile in November, 1967.

At the accident scene, defendant first told bystanders that he had a man and woman with him and had taken them someplace in the area. He later said that he had been to a party with a girl and that the purse and shoes were probably hers. He seemed "dazed" and confused. He was concerned that someone might have been with him in the accident and questioned the witnesses as to whether they had seen any other person.

The automobile was inoperative; so about 2 a.m., two of the persons at the scene took the defendant home. He awakened his father. The two returned to the scene of the accident. They then went to a mill first-aid room to have defendant's head wound tended. The attendant felt defendant might have a concussion and directed him to his family doctor.

At 4:15 a.m., defendant's family doctor sutured the wound and diagnosed a "moderate" concussion. Both the

first-aid attendant and the doctor noticed a fairly strong odor of alcohol about the defendant during this treatment.

On Saturday, January 20th, the defendant remained at home and visited with his girl friend. He suggested reporting the accident to the authorities, but his father told him that a report would not be necessary.

On Sunday, January 21st, after the family read that a woman's body had been discovered near Camp Bonneville, the defendant's father called the sheriff's office. Officers took the defendant into custody as a material witness. While in custody, he made a voluntary statement which was video taped. He also voluntarily gave the officers samples of his head, body and pubic hair. The substance of the statement is:

> After Tom Baldwin took him home at about 11:30 p.m., defendant obtained his red Triumph sportscar and drove on Sixth Street, going toward Vancouver. Near the Little League Ball Park in Camas, he saw a man and woman on the sidewalk. The woman hailed or waved to him. Defendant, thinking the couple had car trouble, stopped and offered assistance. The woman said there was no car trouble, but that she was going to Portland. Defendant offered to give them a ride as far as Vancouver. The woman was described as older and short; while the man was said to be tall, thin, and younger than the woman. The woman sat on the transmission hump of the little two-seat sportscar, between defendant and the other man. Both had been drinking. The man said very little, but the woman related that she had a fight with her husband and was returning to their home in Portland to pack. It was apparent that the tall man was not the woman's husband. While in the car the tall man made advances toward the woman, putting his hands freely on her person. The woman kept pushing his hands away. Defendant felt that it was just a case of an older woman out drinking, who had picked up a younger man.
>
> Defendant was driving west on Highway 830, when the man told him to turn right at 164th Street, which is about one-third of the way to Vancouver. From there the man gave directions for various turns for some 10 miles until they were in the vicinity of Camp Bonneville, which defendant recognized because of his National Guard training there. Defendant recalled making a U-

turn at the lighted gates of Camp Bonneville and going a short distance when he was told to turn left down a cow trail or muddy road where he stopped. No threats were made, but defendant described the man as unfriendly and hostile; so defendant decided to take the couple wherever they wanted to go and get rid of them as soon as possible. Defendant got out of the car, walked a distance into the brush, and relieved himself. When he returned to the automobile, he saw the man's figure in the darkness on the passenger side and heard the man say "get lost." Defendant seized the opportunity to be rid of the two, turned around and drove down the trail to the paved road. By this time, defendant had given up any idea of returning to Vancouver and just wanted to go home. At the intersection of 217th and 68th, he failed to negotiate a turn and rammed into the embankment.

Thus does defendant explain the events which transpired between 11:30 p.m. and 12:15 a.m. on the night in question.

When defendant was first interrogated, he claimed he knew nothing about any purse or shoes. However, after he had been told that witnesses had seen him throw away a woman's purse and shoes, he recalled doing so and related this to the authorities. A thorough search of the area produced only the shoes.

A defense witness, William Meredith, lived near the place where the victim's body was found. Around midnight of January 19th, he was aroused by his dogs; he took a flashlight and went outside to investigate. He observed a small red foreign sportscar driving easterly on 83d Street in an erratic manner. (Defendant's automobile was a small, red Triumph TR3, thus being of similar description.) He shined his flashlight on it and saw that it contained three occupants. The car made an abrupt left turn onto 222d Street. Meredith walked toward the corner at 222d Street and saw that the car went straight and did not turn into Camp Bonneville. Witness Meredith testified that he observed the same car return with only one occupant in it "five, or six, seven, eight minutes" later. He further testified that he observed a "rather tall fellow" walking across a field and onto the roadway about 2 hours after the return of the red automobile.

We first examine defendant's contention that the evidence is insufficient to establish a rape or larceny upon which to predicate a first-degree murder conviction under RCW 9.48.030(3).

As to the charge of rape, the evidence was sufficient to submit this issue to the jury. The victim was found virtually nude. There was an abrasion of the skin on the inside portion of her left thigh. There was seminal fluid in the vaginal vault. This fluid had not drained to other parts of the body, which led the autopsy surgeon to the opinion that the victim had not walked or moved after the act of intercourse. (The defense brought out that the victim and her husband had sexual relations 2 days earlier.) Considering the scene of the crime, the condition of the body, and location of the seminal fluid, there was sufficient evidence to submit the charge of rape to the jury.

Turning then to the issue of larceny-murder. The pertinent portions of RCW 9.48.030 read:

> The killing of a human being, unless it is excusable or justifiable, is murder in the first degree when committed . . .
>
> . . .
>
> (3) Without design to effect death, by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of . . . larceny . . .

The state contends that the evidence shows larceny as defined in RCW 9.54.010(1) and (4), which state:

> Every person who, with intent to deprive or defraud the owner thereof—
>
> (1) Shall take . . . the property of another; or
>
> . . .
>
> (4) Having received any property by reason of a mistake, shall with knowledge of such mistake secrete, withhold or appropriate the same to his own use or to the use of any person other than the true owner or person entitled thereto; . . .
>
> . . .
>
> Steals such property and shall be guilty of larceny.

This portion of the larceny statute was embodied in instruction No. 8, which is assigned as error.

We hold there was not sufficient evidence to establish that the homicide occurred during the commission of, or in withdrawing from the scene of, a larceny as defined in the first section of RCW 9.54.010—larceny by taking the property of another.

A review of the record discloses nothing to indicate that the defendant intentionally took the purse and shoes from the victim either before or after the attack. The more logical inference from the evidence is that they were left in the car and their presence not discovered by the defendant until after the accident. The evidence supports this. The victim's stockings were stained around the heels with some black foreign material, which was similar to the black material found on the floormat of defendant's car on the passenger side. This would indicate that the victim had taken off her shoes after entering the car. It is but speculation and conjecture as to whether the victim had her shoes on when she was attacked and that they were subsequently removed. Further, as to the purse, there is no evidence of a "taking" and to infer that the defendant wrongfully appropriated it in the course of the attack or withdrawing therefrom disregards the inference of innocence in that the victim may well have merely left the purse in the car. This latter inference is consistent with the state's theory as to how the crime was committed. The evidence is not sufficient to show a "taking" of either the shoes or the purse.

The state cites *State v. Wilson*, 38 Wn.2d 593, 231 P.2d 288 (1951), as involving an identical factual situation in which the court found the evidence presented a compelling inference of guilt. Although that case has certain parallels with the case before us, with respect to the larceny-murder charge, it is distinguishable. In *Wilson*, the handle of the victim's purse was found at the scene of the kidnapping, thus providing evidence of a taking. But in the present case, there is no evidence showing that the victim's purse or shoes were taken from her.

 It is well established that the existence of a fact

cannot rest in guess, speculation, or conjecture. *Home Ins. Co. v. Northern Pac. Ry.*, 18 Wn.2d 798, 140 P.2d 507, 147 A.L.R. 849 (1943). This rule is even more essential in criminal cases where the evidence is entirely circumstantial. *See State v. Weaver*, 60 Wn.2d 87, 88, 371 P.2d 1006 (1962), where we said, "While a conviction may be sustained solely on circumstantial evidence, the circumstances proved must be unequivocal and inconsistent with innocence."

Assuming, as we must, that the victim's shoes and purse were left in the car, it could be argued that the taking obtained as soon as the defendant drove away from the scene. Such an argument, however, ignores the requirement of proof of criminal intent to deprive or defraud the owner of property at the time it comes into possession of the defendant. *State v. Olds*, 39 Wn.2d 258, 235 P.2d 165 (1951). The evidence, consequently, was totally insufficient to show a larceny under the first section of RCW 9.54.010.

The evidence shows a larceny as defined in the fourth section of RCW 9.54.010. Defendant admitted he threw the victim's shoes in a field and disposed of her purse. This is sufficient evidence of a larceny by criminal conversion under RCW 9.54.010(4).

However, the latter larceny took place after the fatal attack on the victim. Therefore, the defendant contends, the larceny had no legal relationship to the homicide—that the killing did not occur while in the commission of, or in withdrawing from the scene of, a larceny as required by RCW 9.48.030(3). We agree.

To sustain a conviction for collateral crime murder, the causal connection between the commission of the collateral crime and the death must be clearly established. 1 Anderson, Wharton's Criminal Law and Procedure § 252, at 544 (1957).

A leading case in this area is *State v. Diebold*, 152 Wash. 68, 72, 277 P. 394 (1929), where the defendant had stolen an automobile and, having relented, was returning it to the owner when the automobile hit and killed a pedestrian. Defendant was charged with second-degree murder, the claim being that the homicide occurred while defendant

was engaged in the commission and withdrawing from the scene of a felony. In reversing the conviction, this court said:

> As to when a homicide may be said to have been committed in the course of the perpetration of another crime, the rule is laid down in 13 R. C. L. 845, as follows:
>
> "It may be stated generally that a homicide is committed in the perpetration of another crime, when the accused, intending to commit some crime other than the homicide, is engaged in the performance of any one of the acts which such intent requires for its full execution, and, while so engaged, and within the *res gestae* of the intended crime, and in consequence thereof, the killing results. It must appear that there was such actual legal relation between the killing and the crime committed or attempted, that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it. In the usual terse legal phraseology, death must have been the probable consequence of the unlawful act.

In the instant case, there is no legal relation between the attack on the victim and the alleged larceny committed after the automobile accident. The homicide was not within the res gestae of the larceny.

The state cites *State v. White,* 60 Wn.2d 551, 558, 374 P.2d 942 (1962), in support of its position. In that case, the defendant confessed to beating the deceased in a laundry room and taking her to a closet or storage area where she was further beaten. The confession continued:

> She didn't move anymore then except she sort of raised her arm and I removed her watch and ring. I then started to leave but then came back to where she was lying. I had earlier torn off her panties and had ripped her dress so when I got back into the room I had sexual intercourse with her.

The defendant was convicted of first-degree murder committed with premeditation and while engaged in committing, in attempting to commit, or in withdrawing from the scene of, the crimes of rape and robbery. On appeal, it was argued that the rape and robbery, since they occurred a few seconds after the attack, were disassociated from the

homicide, thus making the felony murder charge improper. This court rejected that contention and affirmed the conviction.

*State v. White, supra,* is patently distinguishable from the case at hand. There was substantial evidence to show that the killing was an incident—a part of the res gestae— of the rape and robbery. In the present case there is no evidence to show a larceny at the scene of the attack, but only a larceny after the defendant's automobile accident when he disposed of the victim's property mistakenly in his possession. The larceny established by the evidence was entirely separate, distinct, and independent from the homicide. The intimate connection between the killing and the crime, which is apparent in *State v. White, supra,* is lacking in the instant case.

Thus, the evidence failed to establish the type of larceny requisite to a larceny murder charge under RCW 9.48.030(3). The defendant timely and specifically objected to this issue and to instruction Nos. 6, 8 and 10 submitting it to the jury.

We are confronted with the issue of whether it is prejudicial error to submit to a jury the issue of the commission of a crime by a particular method or mode when a crime is properly charged as having been committed in two or more ways, but the evidence fails to sustain one of such methods and there is only a general verdict of guilt.

In *State v. Mitchell,* 29 Wn.2d 468, 188 P.2d 88 (1947), we held that such a situation involves prejudicial error. There, the defendant was charged with murder in the first degree committed (1) with premeditation, (2) by an act imminently dangerous to others evincing a depraved mind, and (3) in the commission of or withdrawing from the scene of a robbery. The evidence revealed that defendant, who had a family history of insanity, entered a physician's office, pulled a gun, shot and killed the doctor, and took his ring, watch, and other personal effects. Defendant said that he committed the crime at the instance of God. He was convicted and sentenced to death. On appeal, defendant argued the trial court erred in submitting to the jury the

charge of first-degree murder committed by an act imminently dangerous to others, because there was no evidence to warrant the charge. This court agreed and reversed, stating at page 484:

> After careful consideration of Rem. Rev. Stat., § 2392, in the light of the authorities bearing on the question here under consideration, we believe that the weight of authority and the better reasoning support the conclusion at which we have arrived, namely, that where the act causing a person's death was specifically aimed at and inflicted upon that particular person and none other, the perpetrator of the act cannot properly be convicted of murder in the first degree under subdivision 2 of Rem. Rev. Stat., § 2392, on the theory that the act was imminently dangerous to others, evincing a depraved mind, regardless of human life, without a premeditated design to effect the death of any individual.

> This, of course, does not mean that, under the evidence in this case, the accused could not properly have been convicted of the offense under the other provisions of the statute. It may be that the jury based its verdict on either subd. 1 or subd. 3 of the statute, but we cannot say, as a matter of law, that it did so.

> Since, upon the evidence, appellant could not properly have been convicted under subd. 2 of Rem. Rev. Stat., § 2392, the charge under that subdivision should have been withdrawn. For the same reason, we consider the submission of the case on that charge and the giving of instructions on that issue prejudicially erroneous, in that the jury was thereby authorized to return a verdict of guilty upon a charge not properly in the case.

As in *Mitchell,* the defendant in the present case was charged with first-degree murder, allegedly committed in any of three ways under the statute and the jury was instructed on each method. In both cases, the evidence did not support a first-degree murder conviction in one of the ways asserted, but there was evidence to support the conviction on the other methods involved. It may be that the jury in the respective cases based their verdicts on the charges properly in the cases. However, it cannot be said as a matter of law that they did so.

The rationale of *Mitchell* is that the jury cannot be

instructed on an issue on which there is insufficient evidence, and it is error to do so. *State v. Thompson*, 68 Wn.2d 536, 413 P.2d 951 (1966); *State v. Bruton*, 66 Wn.2d 111, 401 P.2d 340 (1965).

In the instant case, the jury was instructed on a charge of larceny-murder which was unsupported by the evidence. It was error for the court to submit this issue to the jury. Before discussing the question of whether this error was prejudicial, we will endeavor to place the holding of *State v. Mitchell, supra,* in its proper context, as our case law on this point seems to be in a confused, but not irreconcilable, state.

The rule of *Mitchell* must be distinguished from a line of cases in this state which stand for the proposition that when an information charges two or more ways in which a single crime has been committed, proof of it in any one of the ways will sustain the *allegation,* against a challenge of duplicity, provided the means are not repugnant to each other. *State v. Holedger,* 15 Wash. 443, 46 P. 652 (1896); *State v. Parmenter,* 74 Wn.2d 343, 444 P.2d 680 (1968).

There can be no doubt that the information which charges the defendant with first-degree murder committed by premeditation or in the course of a rape or larceny, would withstand a challenge of duplicity. *State v. Fillpot,* 51 Wash. 223, 98 P. 659 (1908). The means of committing the crime are but alternative constituents of the same statutory offense; they do not constitute separate and distinct offenses which are repugnant to each other. The single crime of first-degree murder is defined in RCW 9.48.030, and may be committed in varying ways.

We deem it desirable to discuss the development of the rules relating to duplicity because there is some language in a few of the cases which might be construed to hold that when an information charges two or more ways in which a single crime has been committed, proof of it in any one of the ways will sustain the *conviction.* Such an interpretation would be in direct conflict with *State v. Mitchell, supra.*

The rule under consideration first came to light in this state in the case of *State v. Holedger, supra.* In that case,

the defendant was indicted for publishing, editing, and selling obscene literature in violation of the Penal Code. The statute setting out the crime enumerated, disjunctively, various ways in which it could be committed. The indictment charging the crime, stated, in the conjunctive, that it was committed in certain of the ways enumerated in the statute. This court answered defendant's contention that more than one crime was charged, with the following passage from 1 Bishop's Criminal Procedure § 586 (3d ed.):

> "If a statute makes it a crime to do this, or that, or that, mentioning several things disjunctively, all may indeed, in general, be charged in a single count; but it must use the conjunctive "and" where "or" occurs in the statute, else it will be defective as being uncertain. All are but one offence, laid as committed in different ways. And proof of it in any one of the ways will sustain the allegation. On the other hand, the indictment may equally well charge what comes within a single clause of the statute, and still it embraces the complete proportions of an offence."

*Accord: State v. Gaul,* 88 Wash. 295, 152 P. 1029 (1915), abortion; *State v. Ilomaki,* 40 Wash. 629, 82 P. 873 (1905), placing and allowing wife to remain in house of prostitution; *State v. McBride,* 72 Wash. 390, 130 P. 486 (1913), forgery; *State v. Pettit,* 74 Wash. 510, 133 P. 1014 (1913), larceny; *State v. Klein,* 94 Wash. 212, 162 P. 52 (1917), larceny; *State v. Murie,* 140 Wash. 71, 248 P. 79 (1926), burglary; *State v. Powers,* 152 Wash. 155, 277 P. 377 (1929), rape; *State v. Comer,* 176 Wash. 257, 28 P.2d 1027 (1934), larceny; *State v. St. Clair,* 21 Wn.2d 407, 151 P.2d 181 (1944), cruelty to animals; *State v. Carlson,* 50 Wn.2d 220, 310 P.2d 867 (1957), robbery; *State v. Scott,* 64 Wn.2d 992, 359 P.2d 377 (1964), joy riding—we also held in this case that it was proper to use the disjunctive "or" in pleading such cases rather than the conjunctive "and;" *State v. Cadena,* 74 Wn.2d 185, 443 P.2d 826 (1968), second-degree murder; *State v. Parmenter,* 74 Wn.2d 343, 444 P.2d 680 (1968), manslaughter.

In only a few of the cited cases did the defendant make the further contention that the evidence was insufficient to

support one of the methods or ways of committing the crime charged, and that, therefore, the submission to the jury of those particular methods was improper. For example, in *State v. Pettit, supra,* defendant contended that the information charged more than one crime and that there was no evidence that the crime was committed in the first manner charged. The approach of the court is significant. The question of sufficiency of the evidence to support an instruction on one of the modes of committing the crime charged was treated independently of the issue concerning duplicity, and rightly so. A challenge of duplicity goes to the information, while a challenge to the sufficiency of the evidence goes to the conviction. The rules attendant upon a challenge of duplicity should not be extended beyond sustaining the allegation. *See also State v. Powers,* 152 Wash. 155, 277 P. 377 (1929).

*State v. Morse,* 38 Wn.2d 927, 930, 234 P.2d 478 (1951), contains some language which appears to extend the rules relating to duplicity to sustain not only the allegation, but also the conviction. The defendant in that case was convicted of forgery in the first degree, charged to have been committed by the making, forging, and uttering of a check. On appeal, it was argued that there was no evidence to show that defendant actually made or forged the check and that the charge in this respect was erroneous, even though there was evidence that defendant uttered the check. Rejecting this contention, the court said:

> There is some question whether it was proved that Morse personally made the check. However, the information charged not only that Morse made the instrument, but also that he uttered it. This is not objectionable, since it is not the charging of two crimes, but merely the charging of the commission of two acts, either one of which constitutes the single crime of forgery. . . .
>
> When the information charges two or more ways in which a single crime was committed, proof of it in any one of the ways will sustain the allegation. *State v. Klein,* 94 Wash. 212, 162 Pac. 52; *State v. Spiller,* 146 Wash. 180, 262 Pac. 128; *State v. Powers,* 152 Wash. 155, 277 Pac. 377. It accordingly follows that, if there is sufficient evidence to prove that appellant uttered the check,

the conviction must stand, even if it be said that the state failed to prove that appellant himself made the check.

Although this language appears to enlarge the rule to encompass the sustaining of a conviction by proof of only one of the methods charged, an examination of the record discloses that only the issue of forgery by uttering was submitted to the jury. Therefore, the discussion of whether or not defendant actually forged the check was dictum.[1]

■ Thus, a defendant may be charged with committing a single crime in two or more ways and proof of one will uphold the indictment or information. But before the jury can be instructed on and allowed to consider the various ways of committing the crime alleged, there must be sufficient evidence to support the instructions. Moreover, the instructions must clearly distinguish the alternative theories and require the necessity for a unanimous verdict on either of the alternatives. When such is the case, the prosecutor need not be forced to elect, for fear that half of the jury will find the defendant guilty on one theory and half on another theory. These guidelines are borne out by our recent holdings in *State v. Cadena, supra,* and *State v. Parmenter, supra.*

In *Cadena,* the defendant was charged with second-degree murder committed (1) with design to effect the death of deceased and (2) while engaged in the commission of the felony of second-degree assault. The trial court instructed the jury that defendant would be guilty if they found that he committed the murder under either 1 or 2, and further, that the two were alternatives and only one had to be proved. Importantly, we stated in a footnote on page 195 that "Nowhere is it suggested that the state of the evidence would not have justified an instruction on either or both of these alternative theories." Following the conviction, the defendant argued on appeal that the instruction was improper and the state should be made to elect the theory upon which it was relying, because of the possibility

---

[1]The misleading language of *State v. Morse,* 38 Wn.2d 927, 234 P.2d 478 (1951), was carried forward in *State v. McCaskey,* 55 Wn.2d 329, 347 P.2d 895 (1959):

that half of the jury could have found defendant guilty on one theory and half on the other. We held the instruction was proper and had not confused the jury. The jury was admonished that the two theories were to be treated as alternatives and was adequately instructed on the necessity for unanimity on any one or both of the theories. We also stated at page 196:

> Insofar as appellant suggests that the state should have been required to elect between these alternatives, we again cannot agree. The statute spells out different means by which the crime is committed, and the state, under these circumstances and *within the bounds of the evidence adduced,* is entitled to an instruction on these alternatives. *See State v. Pettit,* 74 Wash. 510, 520, 133 Pac. 1014 (1913).

(Italics ours.)

A similar instruction was given in *State v. Parmenter, supra.* We there held that there was substantial evidence to support a verdict of guilty on either theory as to the manner in which the crime was committed; that the information properly charged the single crime of manslaughter committed in two different modes, not repugnant to each other; and that the state did not have to make an election because the instructions fully cautioned the jury that its verdict must be unanimous as to either the first, or second, or both means charged.

This review of the cases establishes that the rule sustaining an information which charges a crime to have been committed in two or more ways, cannot be employed to sustain a conviction, when the evidence is totally insufficient to warrant an instruction on one of the methods charged. This is in accordance with the holding of *State v. Mitchell,* 29 Wn.2d 468, 188 P.2d 88 (1947).

Therefore, the jury should not have been instructed on the state's theory of larceny-murder. Such a theory was not within the bounds of the evidence. There remains the question of whether this error was prejudicial.

The controlling rules in determining prejudicial error concerning improper instructions are laid out in *State v. Britton,* 27 Wn.2d 336, 341, 178 P.2d 341 (1947):

When the record discloses an error in an instruction given on behalf of the party in whose favor the verdict was returned, the error is presumed to have been prejudicial, and to furnish ground for reversal, unless it affirmatively appears that it was harmless. 3 Am. Jur. 511, § 949. However, it becomes our duty, whenever such a question is raised, to scrutinize the entire record in each particular case, and determine whether or not the error was harmless or prejudicial.

A harmless error is an error which is trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case. . . .

. . .

A prejudicial error is an error which affected the final result of the case and was prejudicial to a substantial right of the party assigning it.

*Accord, State v. Martin,* 73 Wn.2d 616, 627, 440 P.2d 429 (1968).

We are not convinced, after a careful reading of the lengthy trial record, that the presumption of prejudicial error in giving instruction Nos. 6, 8 and 10 has been overcome.

The evidence is entirely circumstantial and, while there is evidence harmful to the defendant, there is much of it supporting the defendant's plausible story. Earlier on the night in question, the victim was observed by many disinterested witnesses. She was accompanied by a man who was not her husband. This man answered the physical description given by defendant of the one whom he had picked up in company with the victim. The two were quarreling and the man was making advances toward the victim. Both had been drinking and showed its effects. This man acted toward the victim in the street much as defendant says the man acted in the car. A small foreign sportscar, similar in description to the defendant's, was observed carrying three people toward the road where the crime took place, and returning only minutes later with a lone driver. Later that night the same observer saw a tall man walking across a field to the road. At the scene of the accident, while still in a dazed condition, defendant first

said that he had a man and woman with him and had taken them someplace in the area, pointing in the direction from which he had come. He later said that he had been to a party with a girl and that the purse and shoes were probably hers. Later when the victim's body was discovered and the crime reported in the newspaper, defendant contacted the authorities, relating that he had taken a man and woman to the area where the crime was committed. The defendant's statement that he had picked up a man and woman and had dropped them off was given before an investigation revealed that the victim had earlier been seen quarreling with a tall man.

It is not our purpose in discussing these facts to act as a "superjury," or to make the prosecutor's burden in circumstantial evidence cases more onerous. Rather, our purpose is to point out that the record before us presents a closely balanced set of facts. Under these circumstances, we cannot conclude that the jury ignored the erroneous instructions. The giving of the instructions on larceny and larceny-murder misdirected the jury and permitted it to find that defendant took the victim's purse and shoes at the scene of the crime, when there was no probative evidence to support such a finding. *State v. Thompson, supra.* The evidence, in its totality, has not overcome the presumption that the instructions complained of were prejudicially erroneous. The case must, therefore, be reversed.

Defendant also asserts that the only larceny which will support a larceny-murder conviction is common law larceny, as opposed to the statutory larceny commonly known as criminal conversion; and that only grand larceny can be the basis for larceny-murder. In view of our disposition of the larceny-murder instruction, we do not reach these two contentions.

Since we are remanding this case for a new trial, we will examine the other assignments of error.

On direct examination, defense counsel avoided questioning witness Baldwin about the trip to Portland earlier in the evening. Instead, counsel limited the direct examination to the boys' activities beginning at 9 p.m. The prosecutor

was allowed, over objection, to cross-examine the witness as to the activities of the boys earlier in the evening, which included the trip to Portland and the attempt to contact a reputed prostitute. At first, the trial court, which had been forewarned of this evidence at a pretrial conference, ruled that the testimony brought out on cross-examination was within the scope of the direct examination, but later rested its decision on the ground that the testimony constituted evidence of collateral misconduct showing lustful disposition.

The defendant contends that this evidence was not properly admissible to show a lustful disposition, was highly prejudicial, and beyond the scope of the direct examination.

The general rule is well established in this state that an accused must be tried for the crime or crimes with which he is being charged, and it is error to admit evidence of an unrelated crime, unless the latter falls within the ambit of certain recognized exceptions. *State v. Goebel,* 40 Wn.2d 18, 240 P.2d 251 (1952); *State v. Hames,* 74 Wn.2d 721, 446 P.2d 344 (1968).

This court has often invoked an exception to the general rule, in certain sex crimes, to permit evidence of collateral sexual misconduct, when it shows a lustful disposition directed toward the offended female. *State v. Thorne,* 43 Wn.2d 47, 260 P.2d 331 (1953); *State v. Fischer,* 57 Wn.2d 262, 356 P.2d 983 (1960); *State v. Leohner,* 69 Wn.2d 131, 417 P.2d 368 (1966).

In *State v. Thorne, supra,* we stated at page 60:

> It is axiomatic that an accused must be tried for the offense charged in an information, and the introduction of evidence of unrelated crimes can be grossly and highly prejudicial. *State v. Goebel,* 36 Wn. (2d) 367, 218 P. (2d) 300 (1950). However, in the trial of cases involving carnal intercourse between the sexes it is permissible to show prior acts of sexual misconduct with the offended female even though such prior act is in itself a crime. *State v. Jordan,* 6 Wn. (2d) 719, 108 P. (2d) 657 (1940) and cases there cited. See, also, *State v. Collier,* 23 Wn. (2d) 678, 162 P. (2d) 267 (1945); and 2 Wigmore on

Evidence (3d ed.) 355 *et seq.*, §§ 398, 399, and the annotation on "Admissibility, in prosecution for sexual offense, of evidence of other similar offenses," 167 A.L.R. 565 (1947). Such evidence is admitted for the purpose of showing the lustful inclination of the defendant toward the offended female, which in turn makes it more probable that the defendant committed the offense charged.

Nor does the fact that the confession relates to a sexual offense of a character different from that charged make it less admissible. The important thing is whether it can be said that it evidences a sexual desire for the particular female.

Although the exceptions are normally applied in cases where the evidence sought to be introduced did in fact constitute criminal conduct, it is clear that such is not a prerequisite to application of the exceptions. *See State v. Hames, supra,* where we said at page 722 that "the testimony probably falls short of establishing other crimes," but nevertheless found it to be admissible under the exceptions to the general rule. However, it is questionable whether the mere attempt of defendant and his companions to contact a reputed prostitute constituted a crime or sexual misconduct.

Aside from a consideration of whether the evidence tended to show a crime or sexual misconduct, it cannot be admitted under the lustful disposition exception, because it was in no way connected with, or directed toward, the victim. It cannot be said that since defendant knocked on the door of a house where a prostitute was reputed to live, it is more probable that he committed the offense charged, or that his conduct evidenced a sexual desire for this particular victim, whom he had never met.

It may be that in certain cases the fact that a particular defendant has frequented houses of ill repute to satisfy his lustful inclinations, makes it more probable than not that he committed a rape. But in this case there is only an isolated incident of four boys driving around and, for a joke, deciding to go to the house where a prostitute was reputed to live, where the defendant volunteers to go to the door and knock. This is not the type of conduct which would show a

lustful propensity toward any particular female, much less the victim.

On the other hand, the evidence in question may have been admissible as being within the scope of the direct examination, as the trial court first held. This evidence was relevant in that it presented a complete picture of the defendant's activities a few hours prior to the commission of the crime, an important consideration in any murder trial.

Although the trial court has wide discretion in determining the scope of cross-examination (*State v. Jeane*, 35 Wn.2d 423, 213 P.2d 633 (1950)), and in determining the admissibility of relevant evidence (*State v. Schock*, 41 Wn.2d 572, 250 P.2d 516 (1952)), the probative value of the evidence must be weighed and balanced against any prejudice which it may entail; this is to say, evidence, however competent, is rarely admissible when its relevancy is entirely engulfed by the prejudice which it may engender.

Considering the issues involved in this case, we fail to see how the fact that defendant knocked on the door of a reputed house of prostitution would have any bearing on any element of the crime with which he was charged. The evidence was inflammatory on its face and could only prejudice the defendant's substantial rights to a fair trial. We hold that the trial court abused its discretion in this respect. Upon a retrial of this case, the cross-examination on this matter should be properly limited.

The defendant next urges that the trial court erred in permitting evidence of defendant's training in karate or jujitsu. It is argued that this evidence could only serve to inflame the minds of the jury. This evidence, however, dealt with the physical ability of defendant to inflict the extensive wounds suffered by the victim, some of which being described as defense wounds. The slight prejudice which may have resulted from this evidence did not outweigh its relevancy. There was no abuse of discretion in this matter.

Error is assigned to the testimony of the state's experts based upon comparison of pubic hair taken from the de-

fendant with hair combed from the pubic area of the victim. A state's expert witness testified that one of the pubic hairs obtained from the victim was "microscopically identical" with the defendant's pubic hair. But the defendant's expert witness opined that the hair specimen which the state's witness identified as being identical to the defendant's was not even a pubic hair. Defense counsel objected to the use of the term "microscopically identical," and at the close of the direct examination moved that the testimony be stricken because of failure to state a proper conclusion.

The basis of defendant's motion to strike the evidence is that the expert failed to state an opinion as to the meaning of his findings in terms of identifying the accused. Defense counsel argues that this omission causes a failure to achieve that beneficial purpose for which expert testimony is admissible, and tends instead to mislead and prejudice the jury by attaching impressive sounding adjectives to the subject matter studied (*e.g.,* hair samples), without explaining the description in legally pertinent terms. As a result, it is argued, the testimony of the expert loses its efficacy and should be stricken.

The purpose and justification for expert opinion testimony is to furnish meaningful deductions from physical facts in evidence, which deductions are not within the general capacity of laymen. *E.g., Hill v. Great Northern Life Ins. Co.,* 186 Wash. 167, 57 P.2d 405 (1936); *Ewer v. Johnson,* 44 Wn.2d 746, 270 P.2d 813 (1954). When an expert witness describes his observations pertaining to the physical evidence, he is presumably explaining the foundation upon which his opinion will be premised. It is the statement of opinion that explains and gives meaning to the foundation testimony. When no such explanation is forthcoming, the trier of fact is left with the unelucidated foundation testimony which, standing alone, may be misleading and prejudicial. The failure of an expert to state an opinion under these circumstances negates the very reason for the rule permitting expert opinion testimony. If the foundation testimony of the expert is misleading and prejudicial when

given without the conclusion of the witness, all such testimony should be stricken.

Here, the term "microscopically identical" serves only to embellish the description of the physical evidence; it does not express a deduction from that evidence. Unexplained, the term could be misleading and leave the impression that the compared items came from the same source—an implication that cannot be verified or disproved by the application of common knowledge.

However, the defendant's contentions lose their efficacy when viewed in light of the entire record. The meaning of the foundation testimony in terms of identifying the defendant was explored in detail on cross-examination of the state's expert and was further explored during the examinations of defendant's expert witness. The void existing at the time of defendant's motion to strike was filled, and any error on this point was cured by the subsequent explanations of the meaning of the foundation testimony.

Defendant also contends that the very use of the term "microscopically identical" is prejudicial. The expert witness for defendant, Dr. Paul Kirk, testified that there is no such thing as microscopically identical hairs, that it is not clinically achievable, and is not an acceptable term in hair identification.[2]

The state's expert, before using the term in relation to his testimony, explained to the jury that the term "microscopically identical" is one of three classifications that he uses in expressing the degree of physical similarity between compared hair specimens. The jury had before it testimony explaining the meaning of hair comparison results in terms of establishing identity. Under these circumstances, we do not agree with defendant's assertion that the mere use of these words was prejudicial.

Finally, defendant claims that the trial court erred in systematically excluding prospective jurors opposed to capital punishment, relying on *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968).

---

[2]*But see People v. Carter*, 48 Cal. 2d 737, 312 P.2d 665 (1957).

This assignment involved the issue of whether it is error to exclude prospective jurors who evince a strong feeling against capital punishment, where the trial court initially explains the grounds for disqualification in terms of inability to find the defendant guilty (RCW 10.49.050), as distinguished from an inability to impose the death penalty, but where the subsequent questioning of individual veniremen did not maintain this distinction.

■ On the same day *Witherspoon* was decided, the Supreme Court also decided *Bumper v. North Carolina,* 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968), where it was held the exclusion of potential jurors opposing capital punishment was not reversible error because the sentence imposed was life imprisonment and there was no showing that the jury selected was "prosecution prone."

It is our opinion that *Bumper v. North Carolina, supra,* controls the disposition of this assignment of error. As we do not expect the same problem to recur when a new jury is impanelled for a retrial, we will not discuss this argument further.

Reversed and remanded for new trial.

HUNTER, C. J., FINLEY, ROSELLINI, HAMILTON, HALE, and McGOVERN, JJ., concur.

August 20, 1970. Petition for rehearing denied.