IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69726-9-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| KIER KEANDE GARDNER, | ) | |
| | ) | |
| Appellant. | ) | FILED: November 3, 2014 |

SCHINDLER, J. — A jury convicted Kier Keande Gardner of assault in the fourth

degree of Charitie Wells and assault in the third degree of Bellingham Police Department

Sergeant Claudia Murphy. Gardner contends the trial court (1) violated his right to due

process by excluding impeachment evidence concerning Sergeant Murphy, (2) violated

his right to present the affirmative defense that he lacked the volition to commit the

charged crimes, and (3) violated his right against self-incrimination. We affirm.

## FACTS

In the early morning hours of July 28, 2012, Bellingham Police Department Officer

Jacob Esparza and Officer Michael Shannon responded to a 911 call reporting a group

of men fighting. A woman told the officers that a man injured in the fight was in her

apartment. The man, later identified as Kier Keande Gardner, had "a wound on the back

of his head" but refused to go to the hospital. The officers handcuffed Gardner so

emergency medical technicians (EMTs) could take him to St. Joseph Hospital.

Gardner called his girlfriend Charitie Wells from the hospital. Wells arrived at the hospital at around 2:30 a.m.

At approximately 3:10 a.m., Whatcom County Corrections Officer Robert Ellsworth heard "raised voices" from one of the hospital emergency rooms. Through the window of the door, Corrections Officer Ellsworth watched as Gardner grabbed Wells and threw her on the ground. When Gardner "opened the door and came out," Officer Ellsworth told him to go back inside. Officer Ellsworth said Wells was on the floor "on all fours." Officer Ellsworth asked Wells "if she was okay and if she wanted to press charges." Wells slowly got up and said, "No." Corrections Officer Ellsworth asked the hospital staff to contact security and call the Bellingham Police Department.

Bellingham Police Department Sergeant Claudia Murphy arrived at the hospital approximately 10 minutes later. Sergeant Murphy spoke to Corrections Officer Ellsworth and then went to talk to Wells. Wells was on her cell phone talking to Gardner's mother Marilyn Gardner. Wells said Marilyn wanted to talk to Sergeant Murphy and handed her the phone. Sergeant Murphy had a brief conversation with Gardner's mother.

Corrections Officer Ellsworth helped Sergeant Murphy place Gardner under arrest for the assault of Wells. Sergeant Murphy handcuffed Gardner while Gardner sat on a gurney. As Sergeant Murphy began reading Gardner his Miranda[1] rights, Gardner said, "Shut up, bitch," then kicked Sergeant Murphy in the face, knocking off her glasses.

The State charged Gardner with assault in the fourth degree of Wells and assault in the third degree of Sergeant Murphy. Gardner entered a plea of not guilty. The defense asserted that as a result of his head injury, Gardner did not have the intent to commit the charged crimes.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Before trial, the State asked the court to conduct an in camera review of a 2009 search warrant application submitted by Sergeant Murphy, police reports, and a letter from the Whatcom County Prosecutor. After conducting the in camera review, the court ruled the information submitted by the State was not material to the pending case and the State did not have an obligation to disclose the information to the defense.

During pretrial motions, the State argued that in order to establish the affirmative defense of diminished capacity, the defense must present expert testimony.

> It came to my attention that there was a diminished capacity defense and that is based on a theory that the defendant has a head injury.
> . . . [I]n order to present a diminished capacity defense the defense must present an expert witness that can establish with some certainty that an injury would have created a diminished capacity for the specific intent of the crime.

The defense attorney stated the defense did not intend to call "a mental health expert" on diminished capacity. The defense argued it was "within the common knowledge of everyone" that a head injury "can make people not think clearly," and that as a result, Gardner "may not have been able to form the requisite intent."

> We have not prepared a mental health expert to come in and discuss diminished capacity. We believe it is within the common knowledge of everyone that an injury to the back of the head such as Mr. Gardner had received prior to his hospitalization is within the general knowledge of everyone that that can make people not think clearly, and that as a result he may not have been able to form the requisite intent to assault these people. We don't believe that we need to bring in an expert to tell us what we think is within everyone's general knowledge.

The court ruled an expert was necessary to establish the head injury prevented Gardner from forming the intent to commit the charged crimes.

> You're saying that a person receives an injury to the back of the head and the jury can, without expert testimony, actually by speculation, guess or conjecture, say, oh, well, the State's failed to prove. The initial burden is on the defense to bring the defense forward, not by speculation or conjecture. . . .

3

I'm not willing to say it's just common knowledge when you get hit in the back of the head you're not able to form intent.

Defense counsel stated Gardner was not asserting a diminished capacity defense and, therefore, an expert was not necessary. Defense counsel argued Gardner could show he did not have the intent to commit the crimes through cross-examination of the State's witnesses about Gardner's behavior.

> Your Honor, whether the defendant testifies or not, I believe that I can get in through cross-examination of all the officers who witnessed his action prior to his hospitalization, the severity of the injury and his behavior that they observed.

The court agreed witnesses could testify about what they observed but could not testify about Gardner's intent.

> Well, you can do that. . . . The fact that he was doing this or doing that, those are observations that are admissible, but you're not going to be able to ask those witnesses what did he intend.

The court ruled that "within the confines of the evidence," the defense could argue the State did not prove Gardner had the intent to commit the charged crimes. The court also ruled that if the defense did not present expert testimony, only Gardner could testify as to his intent. The defense attorney stated the evidence would "make it clear" that Gardner did not have the intent to commit the crimes.

> [DEFENSE COUNSEL:] I guess I hadn't thought this through as a diminished capacity defense per se, that I was actually going to ask or try to prove that he lacked the capacity to form a requisite intent. I believe that the evidence will make it clear that he did not have the capacity to know what he was doing. . . .
> THE COURT: Intent is an element of the crime and you can argue intent from the evidence. But diminished capacity is one that requires expert opinion. . . .
> . . . .
> . . . But intent is always an element and you can argue intent within the confines of the evidence that was presented.
> [DEFENSE COUNSEL]: That is all I was expecting to do.
> [THE PROSECUTOR]: I just wanted to say I appreciate the court's

4

ruling on that. There was a CAT [(computerized axial tomography)] scan that was taken and it's my understanding that there was no brain swelling. That's why we need an expert in these kinds of situations if there's going to be a diminished capacity defense.

THE COURT: It's not diminished capacity. He is arguing that he wishes to argue that the defendant did not intend to do what he did.

[THE PROSECUTOR]: Right. So I guess what we[']re left with - -

THE COURT: That's only going to come in through his testimony, quite frankly, if there's no expert.

The State called Wells, Sergeant Murphy, emergency room nurse Allison Shahan, Corrections Officer Ellsworth, and hospital Security Officer David Smit to testify at trial.

Wells denied Gardner assaulted her. Wells testified that when she tried to stop Gardner from leaving the hospital room, he "moved me out of the way." Wells said she tripped over her foot and fell. Wells testified she was crying because she "feared that they were going to try and charge him."

Nurse Shahan testified Gardner was initially reluctant to cooperate and answer questions about his injury.

[H]e gave us several different names so I knew he wasn't, he didn't want to give his name. And then I heard that he tripped on the stairs, he fell skateboarding, he was ice skating, and there was so many different things that he told me about how he was hurt.

Nurse Shahan testified that she saw Gardner arguing with Wells and Wells crying. Nurse Shahan said that she told Wells she would have to go out to the waiting room if "they couldn't keep it together." Nurse Shahan testified that 15 minutes later, she saw Gardner throw Wells "full force" against the window of the hospital door.

I saw her hit the glass on the door so that - - the doors are just normal size doors but they have a window from probably chest height to the top so you can see, it's a good size pane of glass and she had hit full force into the door and he was behind her and then they both went down on the floor.

Nurse Shahan testified that when she spoke to Wells a few minutes later, Wells was

5

"upset that [Gardner] had tackled her."

On cross-examination, nurse Shahan said that Gardner had bruises on his face, the bruise on one cheek was "pretty swollen," and he had "a laceration over his eyebrow." Nurse Shahan testified that "sleepiness, nausea, vomiting, [and] confusion" could be associated with head injuries. On redirect, Shahan testified that Gardner was not sleepy, nauseous, vomiting, or confused.

Corrections Officer Ellsworth testified that while he was standing in the hallway outside the hospital emergency rooms, he heard raised voices before he "saw a female put her back up against the door. . . . I saw a male approach her, push her up against the door, grab her by her upper torso and kind of throw her to the ground."

Corrections Officer Ellsworth testified that Gardner had "a good-size bandage" on his head "from the top of the scalp to middle of the ear, bottom of the ear." Officer Ellsworth said Gardner showed signs of intoxication, like "slurred speech," and was not cooperative. Officer Ellsworth testified that when Gardner was sitting on the gurney with his legs out in front of him, he lifted "his leg straight up" and struck Sergeant Murphy "in the head or the face" with a "very high kick."

Hospital Security Officer Smit was standing at the foot of the hospital bed while Sergeant Murphy placed Gardner under arrest. Smit testified that Gardner was in a seated position on the gurney when he saw Gardner's "leg come up and strike Sergeant Murphy in the face." Smit testified the kick "was pretty high. It would take a lot of effort to make a kick like that." Smit said Gardner "leaned back, way back to make the kick."

Sergeant Murphy testified that after she arrived at the hospital, she spoke to Corrections Officer Ellsworth, nurse Shahan, and Wells. Sergeant Murphy said that she briefly spoke to Gardner's mother Marilyn on the phone.

Sergeant Murphy testified that Wells "was going between upset and getting very, very frustrated with me because she kept insisting that nothing had occurred." Sergeant Murphy said that Wells told her Gardner was "just angry and drunk."

Sergeant Murphy testified that after placing Gardner under arrest, she was "standing immediately behind him . . . where his shoulders were." Sergeant Murphy testified that as she was reading Miranda rights to Gardner from a card, "out of my peripheral vision I saw a very fast flurry of motion," and "the next thing . . . I felt [was] my entire head exploding on impact . . . . [M]y glasses were completely smashed."

At the conclusion of the State's case, defense counsel stated the defense intended to call two of the officers who responded to the 911 call, Officer Vodopich and Officer Shannon, and a nurse from the jail, Connie Magana, to establish the affirmative defense of lack of volition. Defense counsel said the two officers would testify about Gardner's injury, his behavior, and his insistence that he did not need medical treatment to show "he was not thinking clearly." Defense counsel said jail nurse Magana would testify about "the medications that Mr. Gardner received while he was in the hospital for a possible concussion treatment and the treatment of the staples, and that the staples were removed, and that he questioned why he was at the jail and what he had done to get there."

The State argued the offer of proof concerning the testimony of the jail nurse about a "possible concussion" did not show Gardner did not have the intent to commit the charged crimes. "I don't think the defense is tying together why a concussion could or would cause any sort of inability to form the intent to commit the crime."

The next day, defense counsel argued he did not need an expert to show whether Gardner "actually understood and knew what he was doing at the time." Defense

7

counsel told the court that in addition to Officer Shannon, the defense planned to call

another officer who responded to the 911 call, Officer Esparza, and jail nurse Magana.

Defense counsel stated Gardner "wishes to invoke his Fifth Amendment right and not

testify at all."

The court ruled the testimony of jail nurse Magana was not relevant absent either

the testimony of an expert or Gardner's testimony that he did not have the intent to

commit the crimes.

> To the extent that the issue is one of putting forward a defense of
> diminished capacity, I agree with the State that an expert is required in
> order to establish the diminished capacity defense. And that is lacking in
> this case.
>
> With regard to the issue of intent, which the defense is putting
> forward, the condition of the defendant pre-hospital and his condition post-
> incident is irrelevant and incompetent for purposes of establishing whether
> or not at the time he possessed the intent to commit the act or acts that he
> is alleged to have done.
>
> The determination of whether or not the defendant knew what he
> was doing is something that the police officer as well as the jail personnel
> are not competent to testify about as to whether or not he knew what he
> was doing. Taking his condition pre-hospital or post-hospital, and then
> asking the jury to then speculate on what his intent was at the time, they're
> not competent to do that and it's speculation, conjecture or guess.
>
> So I abide by my earlier ruling that the defense has failed to
> establish the relevance of the testimony of these two witnesses and I will
> not permit that.
>
> . . . .
>
> . . . I understand your position but I say its speculation or guess or
> conjecture without the requisite testimony of either an expert and/or
> testimony from the defendant.

Following the court's ruling, defense counsel asked for a continuance to obtain an

expert. The court denied the request for a continuance. Thereafter, defense counsel

told the court Gardner had decided to testify.

Gardner testified that he remembered only "bits and pieces" of what happened at

the hospital. Gardner said he did not remember interacting with Sergeant Murphy and

"vaguely" remembered why he was at the hospital. Gardner testified, "I just remember getting jumped, that's all I remember." Gardner said he remembered waking up in jail and asking why he was there.

On cross-examination, Gardner testified he remembered seeing Wells at the hospital. "I just remember her showing up. I really don't remember - - I know she was there, that's pretty much all I can remember." Gardner also testified that it was possible he accidentally kicked Sergeant Murphy.

> Q    You said that you do not recall meeting Sergeant Murphy?
> A    No, sir, I don't recall meeting her.
> Q    So your testimony is that you didn't accidentally kick her; is that right?
> A    Um, I'm not saying - - there's a possibility I could have accidentally kicked her, I don't remember, sir.
> Q    Your testimony is you didn't mistakingly [sic] kick her?
> A    What do you mean?
> Q    By mistake.
> A    It's a possibility I could have.
> Q    Possibility you could have done it on purpose, too?
> A    No, that's no possibility.
> Q    How is that if you don't remember?
> A    I guess you have a point there.

The defense also called Officer Esparza and Officer Shannon. Officer Esparza testified that Gardner "had a cut on the back of his head." The court admitted into evidence a photograph of the wound. Officer Esparza said that because Gardner refused to go to the hospital, officers handcuffed him for his own safety before the EMTs took him to the hospital for treatment. On redirect, Officer Esparza testified that Gardner was able to answer Officer Shannon's questions, "like name, date of birth, stuff like that."

Officer Shannon testified Gardner "literally push[ed] the EMTs away from him every time they approached him." Officer Shannon said Gardner did not want to go to the hospital and that "[b]ased on the obvious injury and the insistence of the EMT that he

be seen at the hospital, I, with another officer, put him in handcuffs and escorted him out of the house." Officer Shannon testified Gardner had "a large laceration on the back of his head. There was another laceration I believe on his face and abrasion on his shoulder."

On cross-examination, Officer Shannon testified he is a former certified EMT. Officer Shannon said he checked Gardner's pupils to confirm that they were "equal in size and reactive to light" because that can be an "outward indication of brain trauma or brain injury." Officer Shannon testified Gardner "was speaking clearly and coherently. . . . He wasn't mumbling or slurring in speech." Officer Shannon said, "Based on my training as an EMT I didn't see anything that presented as an immediate danger of an internal head injury."

The defense recalled Gardner. Gardner testified that he had a concussion, that his head wound was closed with staples, and that he first became aware of his injury when he saw "the nurses here at the jail and they told me."

At the conclusion of the evidence, the defense proposed giving a jury instruction on the affirmative defense of volition.[2] The court refused to give the instruction. The court ruled that in the light most favorable to the defense, the evidence showed that Gardner "had no knowledge, no recollection of what occurred." The court stated, "[N]ot having a memory of not kicking somebody is not the same as not having the volition to do it."

The jury found Gardner guilty as charged. The court imposed an exceptional

---

[2] The instruction on volition proposed by the defense states, "The State must prove a certain minimal element of volition to establish criminal liability. In other words, a person must be aware of their actions and voluntarily chose [sic] to take that action."

sentence below the standard range.[3]

## ANALYSIS

Impeachment Evidence

Gardner argues the trial court erred by ruling the State did not have to disclose material impeachment evidence regarding Sergeant Murphy. Gardner asserts he is entitled to reversal under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). To prove a Brady violation, the defendant must establish the State, either willfully or inadvertently, suppressed material or exculpatory impeachment evidence. State v. Mullen, 171 Wn.2d 881, 895, 259 P.3d 158 (2011).

In Brady, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Brady, 373 U.S. at 87; see also State v. Benn, 120 Wn.2d 631, 649, 845 P.2d 289 (1993). In addition to exculpatory evidence, the use of evidence "to impeach the Government's witnesses by showing bias or interest . . . falls within the Brady rule." United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). However, reversal is required only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682; In re Pers. Restraint of Gentry, 137 Wn.2d 378, 396, 972 P.2d 1250, 1260 (1999).

> The constitutional error . . . in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination. As discussed above, such suppression

---

[3] The court's findings in support of the exceptional sentence state, in pertinent part:
1. That the defendant had a severe head injury.
2. That the court believed that he had no memory of the assault.
3. That the defendant acted with intent at the time of the assault.
4. That a sentence of 30 months is a sufficient sentence with the facts of this case.

of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial. Consistent with "our overriding concern with the justice of the finding of guilt," . . . a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.

Bagley, 473 U.S. at 678[4] (quoting United States v. Agurs, 427 U.S. 97, 112, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)).

Here, the State submitted for in camera review information concerning a 2009 case involving Sergeant Murphy. In 2009, a police officer from another jurisdiction contacted Sergeant Murphy to ask for her help. The police officer told Sergeant Murphy that her daughter's roommates were selling marijuana out of the apartment but her daughter did not want to be identified as an informant. Sergeant Murphy talked to the daughter and then went to the apartment, ostensibly concerning vehicle prowls in the neighborhood. After the daughter invited Sergeant Murphy into the apartment, Sergeant Murphy saw a bud of marijuana on the floor. In support of a warrant to search the apartment, Sergeant Murphy testified she was in the area on an "unrelated matter" and the daughter let her into the apartment to talk about vehicle prowls. The Whatcom County Prosecutor describes Sergeant Murphy's testimony as "not accurate or truthful," and states that as a result, the charges against the roommate were dismissed.

We conclude the failure to disclose the information submitted for in camera review did not undermine the confidence in the outcome in this case. Further, if disclosed, the result of the proceedings would not have been different or changed the outcome of the trial.

Sergeant Murphy was the victim of the charge of assault in the third degree and her testimony was limited. The undisputed evidence established that Gardner kicked

---

[4] Emphasis added.

Sergeant Murphy in the face with force, knocking off her glasses. Nonetheless, Gardner claims her credibility was "particularly relevant in light of the conflict between Sergeant Murphy's testimony and that of Ms. Wells and Mr. Gardner's mother." The defense points to conflicting testimony about whether Sergeant Murphy learned that Wells and Gardner were dating during the telephone conversation with Gardner's mother. But by the time of trial, the fact that Gardner and Wells were dating was not in dispute. Wells testified that Gardner was her fiancé.

Gardner also argues the court's ruling limited his ability to cross-examine Sergeant Murphy. A criminal defendant has the right to cross-examine adverse witnesses. U.S. CONST. amend. VI; Douglas v. Alabama, 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965). In determining whether an error infringing a defendant's right to cross-examine was harmless, we consider "the importance of the witness' testimony, whether the evidence was cumulative, the extent of corroborating and contradicting testimony, the extent of cross-examination otherwise permitted and the strength of the State's case." State v. Buss, 76 Wn. App. 780, 789, 887 P.2d 920 (1995), overruled on other grounds by State v. Martin, 137 Wn.2d 774, 975 P.2d 1020 (1999).

Here, the dispute at trial was whether Gardner assaulted Wells and whether he had the intent to commit the assaults. Sergeant Murphy did not see Gardner assault Wells and did not testify about the assault of Wells. Two other witnesses, Corrections Officer Ellsworth and emergency room nurse Shahan, testified about Gardner's assault of Wells.

Sergeant Murphy's testimony about how Gardner kicked her differed slightly from the testimony of Corrections Officer Ellsworth and the hospital security officer. Sergeant

13

Murphy described it as "a donkey kick backwards and then up." Corrections Officer Ellsworth testified that it was a "very high" kick. Hospital Security Officer Smit testified the kick "was pretty high. It would take a lot of effort to make a kick like that," and Gardner "leaned back, way back to make the kick." But because there is no dispute Gardner kicked Sergeant Murphy in the face with force, the discrepancy is not significant.

Right to Present a Defense

Next, Gardner contends the court violated his right to present a defense by excluding the testimony of jail nurse Magana, denying his request for a continuance to obtain an expert witness, and denying his proposed jury instruction on volition.

The Sixth Amendment is violated "where a defendant is effectively barred from presenting a defense due to the exclusion of evidence." State v. Martin, 169 Wn. App. 620, 628-29, 281 P.3d 315 (2012); U.S. CONST. amend. VI. A defendant has a constitutional right to present testimony of witnesses to establish a defense. State v. Cheatam, 150 Wn.2d 626, 648, 81 P.3d 830 (2003).

But the defendant does not have a right to introduce irrelevant or inadmissible evidence. State v. Ellis, 136 Wn.2d 498, 528, 963 P.2d 843 (1998). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. This court reviews a trial court's evidentiary ruling for an abuse of discretion and "will not disturb that decision unless no reasonable person would adopt the trial court's view." Martin, 169 Wn. App. at 628.

Gardner asserts the court abused its discretion by excluding jail nurse Magana's testimony because it is common knowledge that a concussion may impact a person's

14

ability to act with volition.[5] The trial court ruled that absent medical testimony connecting the testimony of the jail nurse of a possible concussion and the need for treatment to Gardner's mental state during the commission of the charged crimes, the testimony was not relevant and speculative. The court ruled, in pertinent part:

> That post-event he was given medications, that requires medical testimony to make a connection between the medications and the effect of those medications, if any, upon him post-event. If the purpose of that evidence is to say that the need for those medications is an indication of his mental state at the time of the event, then that requires medical testimony. So it's not relevant.
>
> . . . .
> . . . The fact of a concussion on the defendant's thought process is a medical issue and requires medical testimony.
> [DEFENSE COUNSEL]: I will not ask her about what this concussion may or may not have caused him to do.
> THE COURT: That's what you're going to want the jury to assume. You want the jury to assume that the concussion does have an effect on his mental state. You can't do that without expert testimony.

The court did not abuse its discretion in ruling that absent testimony establishing a connection between Gardner's head injury and his ability to act with volition, the testimony of the jail nurse was not relevant and speculative.

Gardner also argues the court violated his right to present a defense by refusing to give his proposed jury instruction on volition.

The defendant is entitled to have the court instruct the jury on its theory of the case if evidence supports the instruction. State v. Hughes, 106 Wn.2d 176, 191, 721 P.2d 902 (1986). A defendant is not entitled to an instruction that is not supported by the evidence. State v. Ager, 128 Wn.2d 85, 93, 904 P.2d 715 (1995).

---

[5] Neither of the cases Gardner cites support his argument. See State v. Deer, 175 Wn.2d 725, 733, 287 P.3d 539 (2012) (holding lack of volition is an affirmative defense); State v. Utter, 4 Wn. App. 137, 144, 479 P.2d 946 (1971) (affirming refusal of instruction on volition).

Here, the trial court refused to give the proposed instruction on volition. The court

ruled, in pertinent part:

> [T]he facts of this case, in the light most favorable to the defense, is that the defendant had no knowledge, no recollection of what occurred. But the testimony of the defendant and the facts through the State is that he said, you know, I could have kicked. I mean, not having a memory of not kicking somebody is not the same as not having the volition to do it.
>
> If there had been expert testimony that, for example, theoretically part of his brain was injured which controlled his reactions, his muscle control and reactions, and a doctor could say with this injury a person will kick and flail around, kind of like when people come out of a coma, they're not consciously doing that, they're not doing it intentionally but it's just a muscle reaction, then you get your volition instruction. But here there isn't any evidence other than a loss of memory of the event that he did not choose that course of action and take it.

Lack of volition is an affirmative defense that the defendant must prove by a

preponderance of the evidence. State v. Deer, 175 Wn.2d 725, 733, 287 P.3d 539

(2012). The court reviews the denial of a proposed instruction based on the evidence at

trial for abuse of discretion. State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883

(1998). To determine if the evidence supports giving the proposed jury instruction, the

court views the evidence in the light most favorable to the defendant. State v.

Fernandez-Medina, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000).

The decision in State v. Utter, 4 Wn. App. 137, 479 P.2d 946 (1971), is

analogous. In Utter, the State charged the defendant with manslaughter of his son. The

defendant testified that as a result of his "warfare training," he reacted violently to people

approaching him unexpectedly from behind. Utter, 4 Wn. App. at 138-39. An expert

witness testified about "conditioned response," or "an act or a pattern of activity occurring

so rapidly, so uniformly as to be automatic in response to a certain stimulus." Utter, 4

Wn. App. at 139.[6]

On appeal, the court held there was insufficient evidence of lack of volition "to present the issue of defendant's unconscious or automatistic state at the time of the act to the jury." Utter, 4 Wn. App. at 143. The court concluded, "There is no evidence, circumstantial or otherwise from which the jury could determine or reasonably infer what happened in the room at the time of the stabbing; the jury could only speculate on the existence of the triggering stimulus." Utter, 4 Wn. App. at 143.

Here, as in Utter, Gardner presented no evidence that his head injury caused an involuntary or unconscious action. The court did not err in refusing to instruct the jury on lack of volition. We note that during closing, defense counsel argued the evidence showed Gardner lacked the intent to commit the charged crimes.

Gardner also contends the court violated his right to present a defense by denying his motion for a continuance to obtain an expert witness. This court reviews a decision to deny a continuance for abuse of discretion. State v. Downing, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004). "In exercising discretion to grant or deny a continuance, trial courts may consider many factors, including surprise, diligence, redundancy, due process, materiality, and maintenance of orderly procedure." Downing, 151 Wn.2d at 273.

Before and during trial, the defense consistently took the position that expert testimony was not necessary to establish lack of volition. The defense first asked for a continuance to obtain an expert toward the end of the trial, right before calling witnesses to testify in the defense case. The court did not abuse its discretion in denying the motion for a continuance at the end of trial.

---

[6] Internal quotation marks omitted.

Right against Self-Incrimination

Gardner argues the court compelled him to testify in violation of his right against self-incrimination. The Fifth Amendment to the United States Constitution and article I, section 9 of our state constitution provide that a criminal defendant may not be compelled to give testimony against himself. State v. Unga, 165 Wn.2d 95, 100, 196 P.3d 645 (2008). "The right against self-incrimination is intended to prohibit the inquisitorial method of investigation in which the accused is forced to disclose the contents of his mind or speak his guilt." State v. Mendes, 180 Wn.2d 188, 195, 322 P.3d 791 (2014).

As a general rule, the right against self-incrimination at trial prohibits the State from forcing the defendant to testify. Mendes, 180 Wn.2d at 195. " 'The use of the word "compelled" connotes that the accused must be forced to testify against his will, that the testimony is exacted under compulsion and over his objection.' " State v. Van Auken, 77 Wn.2d 136, 138, 460 P.2d 277 (1969) (quoting State v. Jeane, 35 Wn.2d 423, 433, 213 P.2d 633 (1950)).

Under federal and state law, a defendant's tactical decision to either remain silent or present a defense does not violate the right against self-incrimination. Williams v. Florida, 399 U.S. 78, 83-84, 90 S. Ct. 1893, 26 L. Ed. 2d 446 (1970); Mendes, 180 Wn.2d at 195. In Williams, the Court held:

> The defendant in a criminal trial is frequently forced to testify himself and to call other witnesses in an effort to reduce the risk of conviction. . . . That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination.

Williams, 399 U.S. at 83-84.

18

In Mendes, the Washington Supreme Court held the defendant's tactical decision to testify did not violate his right against self-incrimination. Mendes, 180 Wn.2d at 196.

> The State argues that like many defendants before him, Mendes had to make the tactical decision, in consultation with his attorney, whether or not to take the stand in his defense. We agree. Our case law has consistently held that a defendant is not "compelled" to testify in violation of their constitutional rights in a situation like this case. No one forced Mendes to testify in a constitutional sense. The record establishes that in consultation with his attorney, Mendes chose to take the stand. Although defendants are regularly faced with the dilemma of a choice between complete silence and presenting a defense, it has never been thought of as a violation of the privilege against compelled self-incrimination.

Mendes, 180 Wn.2d at 196. See also Van Auken, 77 Wn.2d at 138 (defendant's choice to take stand to contradict State's evidence was not compelled testimony).

Gardner relies heavily on a statement the court made following an objection during opening statement. The court stated, "As I indicated at side bar, the court is not concerned with the content of [Gardner's] testimony." Because opening statement was not transcribed, the context is not clear. However, the next day, the court ruled that testimony from either an expert or Gardner could establish the effect of the head injury. "I understand your position but I say it's speculation or guess or conjecture without the requisite testimony of either an expert and/or testimony from the defendant."[7]

Here, as in Mendes, the court did not "compel" Gardner to testify in violation of his right against self-incrimination. The record shows that after consultation with his attorney, Gardner made a tactical decision about whether to testify in support of his

---

[7] Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), is distinguishable. In Simmons, the court held that where a defendant testifies in support of a motion to suppress, the court may not admit that testimony at trial. Simmons, 390 U.S. at 394 ("In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another.").

19

affirmative defense.[8]

We affirm the convictions of assault in the fourth degree and assault in the third degree.

WE CONCUR:

---

[8] In his statement of additional authority, Gardner cites State v. Finley, 97 Wn. App. 129, 982 P.2d 681 (1999), for the proposition that a defendant may exercise his right to remain silent and rely on the State's evidence to support a voluntary intoxication defense. But here, there was no evidence showing how the injury affected his ability to act with volition. Gardner also argues the court erred in admitting evidence of his two prior convictions. Gardner asserts his 2003 false statement conviction is inadmissible because it was more than 7 years old at the time of trial. But ER 609(b) provides that evidence of a conviction of a crime of dishonesty is inadmissible "if a period of more than 10 years has elapsed since the date of the conviction." (Emphasis added.) Gardner also argues his 2010 first degree theft conviction is not a crime of dishonesty. Theft is a crime of dishonesty admissible under ER 609(a)(2). State v. Ray, 116 Wn.2d 531, 545, 806 P.2d 1220 (1991). Gardner's other arguments do not inform the court of "the nature and occurrence of [the] alleged errors." RAP 10.10(c).